# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00140-SCT

*HOMAN WRIGHT, INDIVIDUALLY, AND IN HIS CAPACITY AS ADMINISTRATOR OF THE ESTATE OF EMMA JANE JONES WRIGHT*

*v.*

*MAMIE K. ROBERTS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/30/1998 |
| TRIAL JUDGE: | HON. TIMOTHY E. ERVIN |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | RAYMOND G. O'NEAL, III |
| | ROBERT DON BAKER |
| ATTORNEY FOR APPELLEE: | C. MICHAEL MALSKI |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | REVERSED AND RENDERED IN PART; REMANDED IN PART - 10/11/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/1/2001 |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. In December of 1995, attorney Armon Lee prepared wills, a deed, and powers of attorney for Emma Jane Wright and her husband, Homan Wright. Homan signed his will and power of attorney on December 28,1995, at Lee's law office. Emma Jane signed the deed, her will, and her power of attorney on January 2, 1996, while on her eventual death bed.

¶2. The deed conveyed, to the exclusion of her husband Homan, Emma Jane's two-thirds interest in 200 acres of timber in fee simple to Mamie Roberts, a cousin by marriage, and reserved a life estate in a house and one acre of land surrounding the house for Emma Jane and Homan. Emma Jane's will conveyed all of her remaining property to Roberts, in trust for the care of Homan, then to Roberts and to Roberts's children upon Homan's death. Homan's will had parallel provisions. The attorney was not present when Emma Jane signed the instruments. One of the attesting witnesses to Emma Jane's will was the attorney's secretary. The other attesting witness noted on her affidavit that neither the secretary nor Emma Jane identified the document she signed as a will, rather it was referred to as "papers to take care of Homan Wright". She also marked through on the affidavit the part which said "Emma Jane was of sound and disposing mind."

¶3. The powers of attorney gave Roberts complete power to run the Wrights' affairs. Attorney Lee had been Roberts's attorney over the years, having done extensive land transaction work for Roberts and her

son. Attorney Lee predeceased Emma Jane.

¶4. Emma Jane died on January 22, 1996, and a week later, Homan filed suit to set aside the deed and to contest the will which Emma Jane executed. On May 27, 1997, Roberts presented the will for probate and the cases were later consolidated The matter was continued twice because Roberts was hospitalized, and it eventually was heard in August of 1998.

¶5. The Chancellor issued his opinion on December 30, 1998, finding the following:

1. A confidential relationship did not exist between Roberts and the Wrights.

2. Even if a confidential relationship existed, Roberts's action of taking all of Emma Jane's real property did not over-reach or abuse her authority as the dominant party to the relationship.

3. Although Emma Jane stated specific items which were inconsistent with the instruments which were executed, she knew the objects of her bounty and the quantity of her estate and had testamentary capacity.

4. Although Dr. Coghlan examined Emma Jane shortly before the execution of the documents and stated her condition at that time as "senile" and suffering from other ailments, such did not meet the legal criteria of lack of capacity.

5. There were no suspicious circumstances surrounding the execution of the documents.

Aggrieved, Homan Wright brings this appeal raising the following six issues:

**I. THE CHANCERY COURT MANIFESTLY ERRED IN NOT FINDING SPECIFICALLY THAT A FIDUCIARY OR CONFIDENTIAL RELATIONSHIP EXISTED BETWEEN EMMA JANE AND HOMAN WRIGHT AND MAMIE ROBERTS AND THAT POWERS OF ATTORNEY SIGNED BY THEM INTERPOSED NO CONFIDENTIAL RELATIONSHIP BECAUSE THEY WERE SET UP ONLY TO PROTECT THE ATTORNEY IN FACT, MAMIE ROBERTS.**

**II. THE CHANCERY COURT MANIFESTLY ERRED IN FAILING TO APPLY THE CORRECT STANDARD, IN THAT THE EXISTENCE OF A CONFIDENTIAL RELATIONSHIP REQUIRED INDEPENDENT COUNSELING FOR BOTH HOMAN WRIGHT AND EMMA JANE WRIGHT.**

**III. THE CHANCERY COURT MANIFESTLY ERRED IN FINDING THAT MAMIE ROBERTS DID NOT OVERREACH OR ABUSE HER AUTHORITY AND THAT THE ONLY THINGS DONE WERE FOR EMMA JANE'S BENEFIT.**

**IV. THE CHANCERY COURT MANIFESTLY ERRED IN FINDING THAT NO "SUSPICIOUS" FACTS EXIST SURROUNDING THE EXECUTION OF THE DOCUMENTS.**

**V. THE CHANCERY COURT MANIFESTLY ERRED IN FINDING THAT THE ONLY EVIDENCE OF LACK OF CAPACITY WAS THE TESTIMONY OF DR. COUGHLAN AND THAT DID NOT RISE TO THE REQUISITE LEVEL OF PROOF.**

## VI. THE CHANCERY COURT MANIFESTLY ERRED IN FINDING THAT EMMA JANE KNEW THE QUANTITY OF HER ESTATE.

¶6. Because we determine that the chancellor abused his discretion and committed manifest error, we reverse and render in part and remand in part.

## FACTS

¶7. Emma Jane and Homan Wright lived in an old frame house which she had inherited from her father. They did not have the amenities of an air-conditioner, hot water, telephone or bathroom (only an outhouse). They had married late in life and had no children. Emma Jane managed their finances. At her death, they had been married for twenty-four years. Homan is a retired saw mill and chicken farm worker. He had only attended a few days of school in the first grade, and his literacy was limited to signing his name.

¶8. Mamie Roberts was married to one of Emma Jane's cousins and had known Emma Jane for fifty-eight years. When Emma Jane's health declined, Roberts provided her with transportation to the doctor and helped her in other ways. On December 9, 1995, when Emma Jane's medical condition worsened, Roberts took Emma Jane to the hospital where she was admitted. By that time Roberts had begun assisting Emma Jane in paying bills.

¶9. Armon Lee, the attorney who prepared the documents, had done extensive work for Roberts and her son. Roberts stated in her deposition that she had chosen Armon Lee to prepare the power of attorney because he was a good attorney. In court she refuted that she had selected the attorney, but stated that she had driven Homan to Armon Lee's office on December 28, 1995 where he signed his power of attorney. Roberts's son was present at the attorney's office when Roberts and Homan arrived. Roberts's son testified that his presence was just a coincidence. Homan was never consulted regarding his wishes. No one identified the instrument as a broad power of attorney, and Homan thought he was signing something which would allow Roberts to take care of his mail. Homan testified that he would not have signed otherwise. Roberts testified that she requested that the Wrights execute powers of attorney in her favor to facilitate her helping them with their affairs and to protect herself.

¶10. Roberts testified that her son was fairly sophisticated concerning real estate and that he had "owned a good bit, and his dad before him owned a good bit." When asked if her son had ever met with Armon Lee to discuss how the documents were to be prepared, Roberts replied, "Not about that, I don't think. But now he was with Mr. Lee. He's, he's a busy man, and Mr. Lee did his work."

¶11. Roberts conceded that Lee was an attorney with whom Emma Jane had never had prior dealings. She asserts that Armon Lee first came into contact with Emma Jane when he brought a deed unconnected with the Wrights' property to the hospital for Roberts to sign when she was visiting Emma Jane.

¶12. Roberts's brief states "[i]t was Emma Jane who talked to Attorney Lee about the deed, and it was Emma Jane who was in contact with Attorney Lee by phone as to the other instruments." Yet Roberts testified that within a few days of having the power of attorney-drafted, she had the deed and will made in her favor. It is undisputed that the powers of attorney, the deed and wills were prepared at the same time.

¶13. Emma Jane, already very ill, had a particularly bad night of January 1, 1996. Around noon the next day, Roberts visited Emma Jane and Homan at the hospital. During that visit, Roberts called Lee's secretary

to ask if the documents were ready and to request that someone bring them to the hospital because Emma Jane was "ready to sign her papers." Although Lee was at lunch, his secretary brought the documents immediately. Five or six relatives, including Roberts, were in Emma Jane's hospital room when the secretary arrived. There was testimony of a general confusion in the room and that Roberts was telling jokes. There was conflicting testimony concerning whether the documents were actually read word for word. After approximately one and one half hours of coaxing Emma Jane signed the instruments. There was testimony that she was confused during the process, apparently thinking she was writing a check and that she had asked for, but was not given her glasses. *After* executing the documents, Emma Jane told the secretary of several bequests that she would like for her will to contain. These bequests included a gift of the one-half acre of land that she had just deeded to Roberts and Roberts's son. None of the requested changes were made prior to her death three weeks later.

## STANDARD OF REVIEW

¶14. A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard. If the Chancellor's findings are supported by substantial, credible evidence in the record, this Court will not reverse. *In re Estate of Grantham,* 609 So. 2d 1220, 1223 (Miss. 1992)*.*

## ANALYSIS

¶15. Homan Wright's six assignments of error in essence claim that the chancery court committed manifest error by not finding that Mamie Roberts and Emma Jane had a confidential relationship and that Roberts exerted undue influence over Emma Jane through this confidential relationship. Because of this alleged undue influence, Homan argues that both the will and deed in question must be voided.

¶16. The law in this state on fiduciary or confidential relationships and undue influence is well settled. Its application has been made to both inter vivos and testamentary transactions. *Murray v. Laird*, 446 So. 2d 575, 578 (Miss. 1984). With both gifts testamentary and gifts inter vivos, once the presumption of undue influence has been established, the burden of proof shifts to the beneficiary/grantee to show by clear and convincing evidence that the gift was not the product of undue influence. *In re Estate of Dabney*, 740 So. 2d 915, 921 (Miss. 1999).

### I. DID A CONFIDENTIAL RELATIONSHIP EXIST BETWEEN EMMA JANE AND ROBERTS?

¶17. This Court has long held that a confidential relationship does not have to be a legal one, but the relation may be moral, domestic, or personal. The confidential relationship arises when a dominant, over-mastering influence controls over a dependent person or trust, justifiably reposed. *Murray*, 446 So. 2d at 578.

> Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.

*Madden v. Rhodes*, 626 So. 2d 608, 617 (Miss. 1993).

¶18. This Court has enumerated several factors to consider in determining whether a confidential relationship exists:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

*Dabney*, 740 So. 2d at 919.

¶19. Emma Jane and Roberts's relationship had become confidential in nature even before the powers of attorney were signed. Emma Jane had relied on Roberts's son for advice regarding the sale of timber off her land. He had negotiated oil leases for her. He had also arranged for repairs and maintenance on the Wrights' home. When Emma Jane became ill in 1995, Roberts began taking her to the doctor. Roberts admitted her to the hospital in December of 1995. By that time, Emma Jane had entrusted her purse to Roberts who assisted the Wrights in paying their bills. This arrangement continued throughout Emma Jane's hospitalization.

¶20. Clearly, Emma Jane was of advanced age, in poor health, physically and mentally weak and was dependent on Roberts for transportation and medical care. They were related by marriage and had been friends for fifty-eight years. Considering the *Dabney* factors, Homan proved by clear and convincing evidence that Roberts had a confidential relationship with Emma Jane.

## II. DID ROBERTS ABUSE HER CONFIDENTIAL RELATIONSHIP WITH EMMA JANE?

¶21. Having ascertained that a confidential relationship existed between Roberts and Emma Jane, the next inquiry is whether Roberts abused that relationship. With regard to the deed, there is a presumption that it is a product of undue influence, which Roberts must rebut by clear and convincing evidence. With regard to the will, additional proof is required in order to raise the presumption of undue influence and shift the burden of proof to Roberts.

> [A]lthough the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts *inter vivos*, such consequence follows where the beneficiary 'has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;' or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit.

*Croft v. Adler*, 237 Miss. 713, 723-24, 115 So. 2d 683, 686 (1959). Furthermore,

> When there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the subservient to the dominant party, it is presumed void. This is not because it is certain the transaction was unfair; to the contrary, it is because the Court cannot be certain it was fair.

*Estate of McRae,* 522 So. 2d 731, 737 (Miss. 1988).

> Given the finding that a confidential relationship does exist between beneficiary and the testatrix and that the beneficiary has been actively concerned in some way with the preparation or execution of the will, the law raises a presumption that the beneficiary exercised undue influence over the testatrix, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence.

*Dabney*, 740 So.2d at 921.

¶22. While Emma Jane was in the hospital, Roberts took Homan to the law office of Armon Lee. Neither Emma Jane nor Homan had any prior dealings with Armon Lee, nor had Homan ever met him prior to this time. Further, Homan did not ask to be taken to Lee. Roberts conceded that she selected Armon Lee to prepare the powers of attorney, the deed and the wills. Roberts's son was meeting with Lee when Mamie Roberts and Homan arrived at Lee's office. After Roberts's son left, Homan was asked to sign "a paper" which he believed would only allow Roberts to take care of his mail. Instead, the instrument was a broad power of attorney for Roberts to conduct *all* of Homan's affairs. Further, Lee's secretary testified that she had first learned about someone wanting these documents prepared from Mamie Roberts.

¶23. There is substantial evidence in the record to demonstrate that the beneficiary of the will, Mamie Roberts, had been actively involved with both the preparation and execution of the will. Therefore, there is a presumption that Roberts exercised undue influence over Emma Jane, and the burden of proof shifts to Roberts to rebut.

> [Once] the circumstances give rise to a presumption of undue influence, then the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence of: (1) good faith on the part of the grantee/beneficiary; (2) grantor's[/testator's] full knowledge and deliberation of his actions and their consequences; and (3) [independent consent and action by the grantor/testator].[1]

*Murray*, 446 So.2d at 578.

### III. DID ROBERTS REBUT THE PRESUMPTION OF UNDUE INFLUENCE BY CLEAR AND CONVINCING EVIDENCE?

*A. Did Roberts prove she exercised good faith by clear and convincing evidence?*

¶24. This Court has previously stated that the important factors for the appellate court to consider in determining whether the grantee/beneficiary used good faith are:

> (a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument."

*Id.*

¶25. Roberts and her son had both tried to buy Emma Jane's land on several occasions. With Emma Jane's permission, Roberts's son had put a cabin built by their grandfathers on the land in the 1970's. He stated that it was his desire that the property with which he had been familiar all his life, and on which he had hunted over the years, remain in his family. He testified that he offered to buy the land from Emma Jane, but

that she "definitely" did not want to sell it. He later testified that he never "tried to buy Mrs. Wright's part," rather the remaining one-third interest owned by Emma Jane's closest blood relatives in Birmingham, Alabama. Roberts herself testified: "I went out there, and it was hot, it was hot as it could be. And I said, 'Emma, why don't you sell me this land and let me help you get somebody to put you in a bathroom and things that you need and an air conditioner.'" Homan testified, regarding the land, that "[e]ver time, Mrs. Mamie Roberts tried to buy it."

¶26. Roberts stated that she did not consider Homan capable of caring for himself and that she had arranged for him to be admitted to a personal care home while Emma Jane was in the hospital. Yet at the time of trial (three years later) Homan was still living independently. . . even gardening.

¶27. Emma Jane's primary concern was that Homan was cared for after her death. Regarding her power of attorney over the Wrights' affairs, Roberts testified that she had believed she "might have to sell some of the timber to take care of Homan, because he needed eye surgery." Nevertheless, her attorney prepared documents giving *her* Emma Jane's timber. In her brief she stated: "There was no need for either of them, especially Homan, to own any land beyond the reserved life interest." Additionally, Lee was never paid for his services, nor was anyone ever billed.

¶28. Roberts's only evidence of good faith was her testimony that she intended only to do what was in Homan's best interest, since she had promised Emma Jane she would take care of Homan for the rest of his life. This testimony is insufficient to rebut the undisputed evidence to the contrary.

¶29. Roberts selected the attorney, arranged for the preparation of the documents in which she was a beneficiary, and attended their signing. Emma Jane was presented the documents while lying sick in her hospital bed. Any consideration given by Roberts was dubious, at best, consisting primarily of an illusory promise to take care of Homan in the future.

¶30. Roberts has failed to prove by clear and convincing evidence that she acted in good faith in her dealings with Emma Jane.

> *B. Did Roberts prove Emma Jane had full knowledge and deliberation of her actions and their consequences by clear and convincing evidence?*

¶31. This Court has not hesitated to set aside instruments where there were suspicious circumstances regarding their execution. In one such case involving an elderly couple, no consideration was given for a deed, the grantors thought they were signing a will, the wife was physically exhausted by caring for her husband, both lacked mental capacity, and one thought they could still sell the property. ***Ladner v. Schindler***, 457 So. 2d 1339 (Miss. 1984). This Court has stated:

> Factors important to address the grantor/testator's knowledge, at the time of execution of any instrument are (a) his awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.

***Murray***, 446 So.2d at 578.

¶32. Emma Jane's physician, Dr. Coghlan, had seen her near the time she signed the documents. He testified: (1) Because she was in congestive heart failure she might not have been getting adequate oxygen to her brain, and it may have affected her mental ability some; (2) She would not take the oxygen which would affect her ability to remain conscious to a certain extent; (3) In noting that he would not rely on her ability to understand the effect of signing a deed conveying real property on that date, he stated, ". . . if I were dealing in some kind of business deal with her, I would not have thought she was competent to make the business arrangement. . . I had a problem with the decisions that she made in regard not to eat, not to take her medication, and not to do anything along that line that would have been contributing to her health."

¶33. During that period of time, Dr. Coghlan noted that she was probably unable to concentrate due to the state of her health. It was his impression that Emma Jane was senile prior to and including the time during which she signed the documents.

¶34. In addition to Dr. Coghlan's testimony, there was other evidence of Emma Jane's lack of capacity. Testimony by Roberts and the lawyer's secretary showed lack of capacity. Roberts conceded Emma Jane seemed confused and believed that she was writing a check for legal services. The lawyer's secretary testified that after signing away her real property by deed, Emma Jane then attempted to convey by will land which she had just deeded away.

¶35. Roberts also admitted that Emma Jane asked for, but was not given, her glasses. Regarding the documents, Roberts stated, "She couldn't read 'em very well. She wanted her glasses. . . . They were in the drawer right there by her, in her bed, in the stand . . .." Emma Jane's confusion at the time of signing clearly created doubt as to whether she knew the quantity of her estate.

¶36. Roberts has failed to present clear and convincing proof that Emma Jane exhibited full knowledge and deliberation of her actions.

### C. Did Roberts prove Emma Jane had independent consent and action?

¶37. We have previously stated that "[t]he participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action. *Harris v. Sellers,* 446 So. 2d 1012, 1015 (Miss. 1984).

¶38. This third prong of the *Murray* test for rebutting the presumption of undue influence, was formerly stated by this Court as, "Advice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest." *Murray*, 446 So. 2d at 578. However, three years later this Court revised the third prong, stating:

> The independent advice prong of Murray has been read too strictly. Considering the heavy burden placed upon one seeking to overcome the presumption of undue influence, we find it necessary to redefine the third prong of the Murray test. This we do to the end that the power our law vest in property owners to make bona fide inter vivos gifts not be practically thwarted by often impossible evidentiary encumbrances. We declare that the appropriate third prong of the test is a requirement that the grantee/beneficiary prove by clear and convincing evidence that the grantor/testator exhibited independent consent and action.

*Mullins v. Ratcliff*, 515 So. 2d at 1193.

¶39. There is no proof that Emma Jane or Homan spoke with any other attorney independent of Armon Lee, the Roberts's attorney, before or after signing the documents. When Roberts was asked if she were aware of whether Emma Jane or Homan had ever talked to any attorney other than Armon Lee regarding the documents, she stated that she was not. Roberts and her son used Armon Lee extensively as their attorney. Roberts testified that neither Emma Jane nor Homan had ever contacted Armon Lee to perform legal services.

¶40. Roberts in one instance stated that she procured the preparation of the documents, but in another she denied this. It appears that the documents were prepared before the Wrights were consulted, because Lee's secretary, based upon personal knowledge, believed that Homan could not write his name and had typed spaces for his mark to be attested by witnesses. It was Roberts's son who brought to the secretary's attention the fact that Homan could sign his name. If the Wrights had, in fact, consulted the lawyer, he would have likely determined such information. Furthermore, the documents were prepared in early December, and some were not signed until the next month. Lee's secretary testified that Emma Jane was hesitant in signing the will. Even Roberts stated: "I didn't know whether she was [going to sign] or not. She wanted to think about it, and she wanted to think about selling the place . . .. " Roberts told Emma Jane that if they kept the secretary too long, it would cost them money. In an attempt to convince Emma Jane to sign, Roberts told her that if she did not sign, her property would go to the state and the lawyers. Roberts's brief unconvincingly states that this was not an effort to coax Emma Jane, rather, merely an "expression of frustration."

¶41. It is clear from the record that Roberts failed to prove by clear and convincing evidence that Emma Jane exhibited independent consent and action.

## CONCLUSION

¶42. Homan showed by clear and convincing evidence that a confidential relationship existed between Emma Jane and Roberts, thereby creating a presumption that the deed was the product of undue influence. Homan has further shown that Roberts abused that confidential relationship by being involved in the preparation and execution of Emma Jane's will, under which Roberts was the main beneficiary, raising a presumption that the will was the product of undue influence. In order to rebut this presumption of undue influence, Roberts had to prove by clear and convincing evidence (1) good faith on her part, (2) full knowledge and deliberation of her actions and their consequences on the part of Emma Jane, and (3) independent consent and action by Emma Jane. Not only did Roberts fail to prove each and every element as required by Mississippi law, she failed to prove even one of the three elements.

¶43. The chancellor was manifestly in error in his decision. For the reasons set forth herein, this Court reverses and renders with regard to the validity of the will and deed executed by Emma Jane Wright, which are void. We remand this case to the chancery court for further action, consistent with this opinion, with regard to administration of the estate of Emma Jane Wright in the absence of the will.

¶44. **REVERSED AND RENDERED IN PART; REMANDED IN PART.**

**PITTMAN, C. J., BANKS AND McRAE, P. JJ., SMITH, WALLER AND DIAZ, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE OPINION. MILLS, J., NOT PARTICIPATING.**

1. Originally this Court worded the third prong of this test as "advice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest." *Murray*, 446 So. 2d at 578. However, later this Court changed the third prong to "independent consent and action by the testator."*Mullins v. Ratcliff*, 515 So. 2d 1183, 1194 (Miss. 1987).