937 So.2d 467 (2006)
In re CONSERVATORSHIP OF Virginia B. COOK.
Camille C. Robinson, Appellant,
v.
John B. Cook, Jr., as the Personal Representative of John B. Cook, Sr., Deceased, and Virginia B. Cook, Appellees.
In re Conservatorship of Virginia B. Cook.
Camille C. Robinson, Appellant
v.
John B. Cook, Jr., as the Personal Representative of John B. Cook, Sr., Deceased, and Virginia B. Cook, Appellees.
Nos. 2004-CA-02303-COA, 2005-CA-00395-COA.
Court of Appeals of Mississippi.
September 5, 2006.
*468 Robert Lewis Spell, attorney for appellant.
Mark W. Prewitt, Vicksburg, attorney for appellees.
Before LEE, P.J., SOUTHWICK and ISHEE, JJ.
SOUTHWICK, J., for the Court.
¶ 1. This is a suit between a brother and sister whose 92-year old mother granted significant financial benefits to the brother. After a trial, the chancellor upheld the gifts. On appeal, the sister alleges that the evidence does not support the chancellor. We disagree and affirm.

FACTS
¶ 2. Mrs. Virginia Cook, born in 1910, is a life-long resident of Warren County, Mississippi. She has been a widow since 1953. Mrs. Cook has three children  John, Camille, and Theodore. Camille Robinson, a resident of the Commonwealth *469 of Virginia, brought suit against John, while Theodore has apparently had no desire to participate in this litigation and has never been a party. John died prior to the conclusion of this case. His son, John, Jr., has been substituted.
¶ 3. In the early 1960's, Mrs. Cook inherited $50,000 and 360 acres of land from her father. She wanted to live the remainder of her life on the Warren County property. John assisted his mother with investments and business operations to ensure this was possible. At the time of the judgment in this case, Mrs. Cooks' assets amounted to about $342,000. We will discuss the facts of the challenged transactions between Mrs. Cook and her son John as we review the relevant legal principles. For now, we note that both cash and real property were transferred from mother to son. The chancellor's refusal to set those transfers aside is the subject of one of the appeals before us.
¶ 4. The siblings, John and Camille, agreed that a conservator should be appointed for their mother. Each sought that position. John Cook initially was named, and after his death, Camille Robinson was appointed. Camille, after being appointed as conservator of Mrs. Cook, filed a petition that would allow her mother to be moved to Virginia. The chancellor denied the request. One of the consolidated appeals is from that decision. Camille Robinson has resigned as conservator because remaining in Mississippi to care for her mother was too burdensome. The parties agree that the appeal in Cause Number 2005-CA-395-COA from the decision refusing to allow Mrs. Cook to be moved is moot. There is no motion to dismiss, and so we simply affirm that judgment.
¶ 5. We now proceed to review only the appeal from the refusal to set aside the transactions between Mrs. Cook and her son John.

DISCUSSION
¶ 6. The central focus on appeal is whether the evidence supports the findings of the chancellor. Such findings will be upheld if supported by substantial evidence unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard is applied. Hamilton v. Hopkins, 834 So.2d 695, 699 (Miss.2003). We will examine each of the issues raised in light of that standard.

ISSUE 1: Mrs. Cook's mental competence
¶ 7. On July 25, 1975, Mrs. Cook conveyed to her son John an undivided one-half interest in the 360 acres she had inherited. In 1990, upon Mrs. Cook's request, John conveyed a life estate in the house back to his mother. Camille Robinson received a power of attorney from her mother in 2001 while visiting her. In February 2003, apparently having concerns raised during a visit with her mother, Mrs. Robinson used the power of attorney to obtain records from her mother and brother's joint account. Mrs. Cook learned about her daughter's inquiries when she saw a charge on her account for fees involved in the bank's research. Mrs. Cook instructed John to contact an attorney for her. There is evidence that John Cook provided a list of attorneys, and that his mother chose Travis Vance from the list. An appointment was made for Vance to go to the Cook home.
¶ 8. Vance met with Mrs. Cook for over an hour one morning. During this meeting, John was instructed to leave the house. He did so. Mrs. Cook informed Vance of her intentions. Vance prepared a deed, power of attorney, durable power of attorney for health care, and a living will, all in favor of John Cook. Vance had been *470 an attorney for nearly four decades and later testified that he satisfied himself that Mrs. Cook had the mental capacity to execute such documents. Vance testified that Mrs. Cook wanted to execute these instruments in favor of her son because John had taken care of her. Conversely, her daughter Camille lived in Virginia with her family, and her final child, Theodore, had no relationship with her.
¶ 9. Vance consulted with Mrs. Cook on three separate occasions prior to executing these instruments. He testified that each time he was satisfied that these choices were of her own free will, without outside influence, and that she understood the consequences of her actions. Vance once was accompanied by his notary so that the documents could be executed. The notary also was satisfied that Mrs. Cook was mentally competent to execute the instruments.
¶ 10. Mrs. Cook suffered from mild dementia and was under the care of a physician, a registered nurse, and a nurse practitioner. Evidence was obtained from the physician that Mrs. Cook suffered from dementia and did not always possess the mental capacity to execute legal documents. Mrs. Cook's physician also testified that her condition varied and the people in her presence on any given day were better situated to determine Mrs. Cook's mental capacity on that day.
¶ 11. At trial, no medical documentation of an earlier diagnosis of dementia was introduced. None of Mrs. Cook's medical advisors observed her on the day of execution of the relevant documents and could not testify to her mental state on that day. The day of execution of the documents was February 28, 2003. Mrs. Cook was examined by a psychiatrist on May 7, 2003 to obtain an evaluation of competency. The psychiatrist testified that Mrs. Cook stated that she knew she signed the deed conveying her land to John and this was because John and his family had made it possible for her to remain comfortably at home. The psychiatrist concluded that Mrs. Cook was not dominated by John and that she could recall the reasons for signing the deed.
¶ 12. Mississippi law requires that the party seeking to set aside a deed prove that the grantor lacked mental capacity at the time of execution. Whitworth v. Kines, 604 So.2d 225, 235 (Miss.1992). This evidence of mental incapacity must be clear and convincing and not simply that the grantor was suffering from general weakness. Id. The attorney Vance testified about his meetings with Mrs. Cook over a three-day period and concluded that she had been competent to execute the documents at that time. The chancellor went through a comprehensive analysis of case law in a written opinion and concluded that clear and convincing evidence of a lack of mental capacity had not been shown. We find no basis on which to disturb that factual conclusion.
¶ 13. Even if Mrs. Cook was mentally capable to execute legal documents, there is a presumption of undue influence if the beneficiary of the transactions had obtained a confidential relationship with the grantor. Wright v. Roberts, 797 So.2d 992, 998-99 (Miss.2001). The chancellor found that there was a confidential relationship. That finding is not contested. The burden was then on the beneficiary, John Cook, to prove that no undue influence was exerted. We now look at that issue.

ISSUE 2: Confidential Relationship and Presumption of Undue Influence
¶ 14. We start our examination of this issue by looking more closely at some of the transactions that are challenged by *471 Camille Robinson. John Cook and his mother were partners in an endeavor to subdivide forty of the three hundred sixty acres into residential lots. None of the lots was ever sold. There was a written agreement between the two that Mrs. Cook would invest $7,500 and John Cook would invest approximately $49,000. The agreement, dated March 1, 1993, authorized John to recover the difference in their respective investments through the sale or lease of the lots on a pro rata basis. Instead of selling the lots, the land was leased to prospective casino developers. Mrs. Cook and John were paid $172,000 for this lease and the money was held in their joint account. The chancellor found that between July 2002 and January 2003, John was paid the sum of $37,346.87 by his mother. This sum included six percent interest over the ten years the debt was owed. A total of $74,693.75 was withdrawn from this joint account, half of which already belonged to John. The chancellor found that these transactions were done with Mrs. Cook's knowledge and consent at a time when her mental status was not in question. This joint account was closed by Camille Robinson using the power of attorney that she held at that time. Mrs. Robinson retained the remaining $1,030 that had been in the account when it was closed.
¶ 15. Other contested transactions are the following. John Cook transferred his mother's money from one account to a new account with a higher interest rate. The new account subjected the income to taxes and also removed Camille Robinson as a beneficiary. John Cook purchased a vehicle for approximately $10,000. There was evidence that the title was placed in John's name because Mrs. Cook did not have a driver's license and for insurance purposes. The alleged purpose of the vehicle was for John to drive his mother, since Mrs. Cook had difficulty getting in and out of John's previous vehicle. Finally, John Cook used money from his mother's account to pay fees associated with this litigation. John testified that Mrs. Cook authorized this after Camille stated that she would fight John in any way she could.
¶ 16. After finding that there was a presumption of undue influence due to the confidential relationship between Mrs. Cook and John, the chancellor correctly held that the beneficiary could rebut this presumption by clear and convincing evidence. Wright, 797 So.2d at 998. These factors have been identified as necessary for consideration: (1) the good faith of the beneficiary, (2) the grantor's full knowledge and deliberation of the consequences of her actions, and (3) evidence of independent consent and action by the grantor. Id. at 1000. We will look at each of these three considerations.

(1) Good faith on part of beneficiary
¶ 17. The intentions of the beneficiary are an important starting point for determining whether there was undue influence in fact, and not just a presumption. The Supreme Court set out these questions as a means to answer whether good faith existed:
(a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.
Id. (quoting Murray v. Laird, 446 So.2d 575, 578-79 (Miss.1984)).
¶ 18. John Cook had a history of complying with the requests of his mother. Upon her request, he had voluntarily conveyed back to his mother a portion of the *472 land she had previously conveyed to him. John Cook testified that his mother initiated the deed transaction. The attorney's testimony supports that Mrs. Cook initiated the execution of the deed and other documents.
¶ 19. The place of execution was at Mrs. Cook's home. Because of her physical limitations, that was about the only location. Though John Cook resided at this residence as his mother's primary caretaker, it was also the place presumably where the elderly mother would feel the most comfortable in discussing important matters such as these. John Cook was not inside the house during the time when Mrs. Cook and her attorney initially discussed the instruments. Evidence was presented that John Cook was inside the house when the instruments were signed but was not in the same room, as the attorney asked him to leave. Mrs. Cook communicated on more than one occasion that she wanted to execute these documents in favor of her son due to his taking care of her for many years. The instruments were executed with the aid of an experienced attorney with his notary and were promptly recorded in the public record.
¶ 20. None of these considerations on good faith suggest that the chancellor erred.

(2) Full knowledge and deliberation of actions and their consequences
¶ 21. The Mississippi Supreme Court has also presented several considerations on this factor of whether a presumption of undue influence has been rebutted.
(a) [The grantor's] awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
Id. at 1001 (quoting Murray, 446 So.2d at 578).
¶ 22. The attorney Vance testified that he had a private and lengthy discussion with Mrs. Cook about her intentions. John Cook was not present. Mrs. Cook demonstrated that she knew the quantity of land she owned, that she was paid money in the past for an option to purchase the land, that there was no longer an option, and that she had previously conveyed half of her property to John. Mrs. Cook knew that the bank statement indicated that her daughter Camille has caused a charge to be made on the account to respond to Camille's inquiry with the bank.
¶ 23. Mrs. Cook told Vance about all three of her children and particularly the nature of the relationship she had with each of them. Mrs. Cook knew that John would benefit from this legal action and that he would own all of the property. Vance also explained other alternatives such as granting a life estate. Mrs. Cook knew that Camille had access to her bank funds and that John handled her other financial matters. Vance verified that Mrs. Cook wanted to give complete control of her assets to John by revoking Camille's power of attorney and giving John a power of attorney, a durable power of attorney for health care, a living will, and a deed to the entire property.
¶ 24. There was no error in the chancellor's finding that Mrs. Cook, though dependent *473 on others for her care, made her own intentions and pursued having those intentions fulfilled.

(3) Independent consent and action
¶ 25. This consideration has changed somewhat as the caselaw has developed, such that the factors that had initially been outlined for "independent advice" are no longer to be applied in determining whether a presumption of undue influence has been rebutted. The only analysis required is whether the grantor, Mrs. Cook, exhibited independent consent and action. Wright, 797 So.2d at 1002. The chancellor actually found more than was required when she determined that independent advice had been obtained. The attorney Vance testified that he took precautions to ensure John Cook was not near his mother when discussions were taking place about what legal action Mrs. Cook wanted Vance to accomplish on her behalf. Vance testified that he and Mrs. Cook spoke of her past and carried on a normal conversation while discussing her intentions. He questioned Mrs. Cook extensively about what she wanted to do, why she wanted to do it, and if John Cook had influenced her in anyway in making these decisions.
¶ 26. Vance, an experienced attorney, was fully satisfied that Mrs. Cook was acting on her own free will. Vance testified that at all times his only interest was in helping Mrs. Cook perform the legal work she wanted to accomplish. Vance testified that he went over each document line by line and asked Mrs. Cook if she heard anything she did not like or if she wanted to change anything.
¶ 27. Camille Robinson presented evidence that Vance had performed legal work for John Cook's daughters at some point and that Vance and John went to the same church in the 1970's. Vance testified that he had not realized these were John's daughters due to their different last names. Vance also testified that the relationship he had with John Cook was exemplified by nothing more than casual greetings while in church thirty years earlier. John Cook testified that he named at least four attorneys, all of whom had performed legal work for Mrs. Cook or John in the past, and that Mrs. Cook selected Vance.
¶ 28. In addition, a guardian ad litem was appointed for Mrs. Cook. The guardian visited with her on September 24, 2003. The guardian reported that Mrs. Cook wanted to stay where she currently lived and also described her three children. The guardian explained the alleged improper transfers of money. Mrs. Cook responded that "it was alright that John transferred the money to his account as he needs something to take care of me." Mrs. Cook recalled something about a deed or "paper" that divided her property but she could not remember when that had been executed. Mrs. Cook knew that John took care of her and that a medical person would come each morning to bathe her.
¶ 29. The record reflects that Mrs. Cook relied upon her son John for her daily care. Mrs. Cook revealed her high level of trust in John by allowing him to make business decisions and ensure that she would be able to live out her days in this home. John has demonstrated his commitment to his mother by looking after her for many years. The medical personnel that assisted Mrs. Cook and Mrs. Cook's attorney thought she was well treated and that her condition of care was adequate.
¶ 30. This would appear to be a suit in which siblings in good faith, but also with some intensity, disagreed over what was best for their mother and about each other's motives. A court of equity was called upon to examine the evidence that each wished to present on the issues and determine *474 which view was correct. There was substantial evidence to support the court's findings. We affirm.
¶ 31. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.