# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01681-COA

IN THE MATTER OF THE ESTATE OF LISA            APPELLANTS
HOLLY SOJOURNER, DECEASED: BARBARA
Y. SOJOURNER, KAREN SOJOURNER,
KATHERINE CLAIRE SOJOURNER, AND THE
MADISON ARK

v.

SUSAN S. CAMPBELL                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2016 |
| TRIAL JUDGE: | HON. EDWARD E. PATTEN JR. |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JOHN W. CHRISTOPHER |
| ATTORNEYS FOR APPELLEE: | OLEN C. BRYANT JR. |
| | TIMOTHY L. RUTLAND |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED: 03/27/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND WILSON, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. This appeal concerns a chancellor's denial of probate of a last will and testament based on undue influence. We find no error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶2. Lisa Holly Sojourner died June 28, 2015, at the age of 53. She was survived by many family members including her mother, Barbara Sojourner, her two sisters, Karen Sojourner and Susan Campbell, her adopted sister, Denise Sojourner Thompson, her nieces, Karen's daughters, Jennifer "Nicole" Sojourner Kueck and Katherine "Claire" Sojourner, and her

grandniece, Nicole's daughter, Hannah Sojourner.

¶3.    On September 15, 2015, Susan filed a petition for letters of administration and to determine heirship.  Thereafter, on September 28, 2015, Karen filed a petition to probate Lisa's last will and testament.  In response to Karen's petition, Susan filed a complaint to contest the validity of the will.  A trial on the merits was subsequently held in the Chancery Court of Copiah County.

¶4.    At trial, testimony revealed that Lisa had an IQ of seventy-four.  Her reading recognition was at a fifth-grade level, and her reading comprehension was at a third-grade level.  Additionally, Lisa was in the ninth percentile for reading and spelling, and the first percentile for arithmetic.  As a result of her mental condition, a conservatorship was established for Lisa and her estate in 1998.

¶5.    In July 1999, Lisa executed a last will and testament.  Thereafter, on June 4, 2002, Lisa executed a codicil to the will.  Pursuant to Article V of her will, Lisa devised her interest in all real property to her nieces, Nicole and Claire, in equal shares.  Pursuant to Article VI, Lisa devised all of the residue of her property, real or personal, to her grandniece, Hannah, her nieces Nicole and Claire, and her mother, Barbara, in equal shares.

¶6.    In 2012, Lisa developed colon cancer.  Karen became Lisa's primary caregiver. During Lisa's illness, Lisa, Karen, and Susan were involved in a contested partition of land involving a sizeable amount of property acquired from their father.  As a result, Karen retained attorney G. Michael Massey to represent her in the dispute.

¶7.    In 2013, Lisa was diagnosed with Stage 4 liver cancer.  On June 27, 2013, Lisa

executed a second codicil to her will, which was prepared by Massey. Pursuant to the second codicil, Article V was amended to devise Lisa's interest in all real property to her nieces, Nicole and Claire, and her sister, Karen, in equal parts. Additionally, Article VI was amended to leave $5,000 each to Lisa's nephew, John Parker Campbell, and her niece, Dabney Campbell. All of the residue of Lisa's property, real or personal, was devised in equal shares to her grandniece, Hannah, her nieces Nicole and Claire, her mother, Barbara, and her sister, Karen.

¶8.    As a result of her failing health, Lisa moved into Karen's house in January 2014. On April 23, 2014, Lisa executed a new will, prepared by attorney Elise Munn. Under the new will, Lisa left $1,000 to her nephew, John Parker, her nieces, Dabney and Nicole, her grandniece, Hannah, and the Madison Ark. The remainder of Lisa's property was left to her sister, Karen, and her niece, Claire.

¶9.    According to Munn, Lisa was not happy with the way her will was written and wanted specific changes made. Munn was the attorney for Lisa's conservatorship and was aware of Lisa's medical condition. However, Munn was unaware of Lisa's IQ level or her specific weaknesses in reading, spelling, and arithmetic.[1] Munn testified that she knew there was a lot of animosity among the family, and she was aware of the partition dispute wherein the three sisters, Lisa, Karen, and Susan, each owned a one-third interest in a very valuable piece of property. Munn stated that she was "very cognizant" of the fact that Lisa's interest in the property would be left to someone and that that was a matter of interest to a lot of people.

---

[1] Munn testified that she knew Lisa "had deficiencies" and would not be surprised to learn that Lisa's IQ level was 74.

¶10.    Munn testified that she examined and discussed with Lisa the previous will and two codicils. Moreover, Munn discussed with Lisa the changes she wanted to make regarding her property. According to Munn, Lisa understood the effects of preparing a last will and testament, the nature of her estate, and the terms and conditions of the new will prior to its execution. Importantly, Munn testified that there was no reason for her to inquire of or suspect the potential of undue influence in the preparation of Lisa's will.

¶11.    On cross-examination, Munn stated she was unaware that Lisa was living with Karen at the time the will was executed. Munn explained that had she known Lisa was living with Karen, "that may have been [a red flag]," but she did not know if she would have refused to prepare the will as a result.

¶12.    Renee Roberts, Karen's best friend, testified regarding her conversations with Karen and her concerns over Karen's actions. According to Renee, "Karen hates Susan." Karen wanted Lisa to prepare a will and had spoken with Massey about the will. Specifically, Karen wanted Lisa to leave her land to Karen and Karen's daughter, Claire. When asked how Karen planned to get Lisa to prepare a will, Renee responded that Karen would often tell Lisa that neither Lisa's mother, Barbara, nor Susan would take care of her, that only Karen would take care of her. However, Renee advised that when Lisa was diagnosed with cancer, Susan sent a hospital bed to Lisa for her to use at home.

¶13.    Renee further testified that Karen wanted Lisa to get on Social Security disability. Renee knew an attorney who specialized in the area of Social Security and took Lisa to meet with him. When Renee picked up Lisa for the appointment, Karen was present and told Lisa

4

not to mention anything about her land ownership to the attorney, since it would prevent her from receiving disability.

¶14.    On the way to the attorney's office, Lisa told Renee that Karen wanted her to prepare a will.  Lisa started to cry and stated that she loved both of her sisters; however, Karen wanted her to make a will leaving nothing to Susan, but instead, to Karen and Karen's daughter, Claire.  Importantly, Lisa told Renee that she loved both of her sisters and wanted to split her portion of the land between Karen and Susan.  When Renee advised Lisa to let Karen know how she felt, Lisa stated she could not do that because if she did, Karen would not have anything to do with her.

¶15.    Renee testified that Lisa attempted to meet with Massey but was unable to find his office.  As a result, Karen drove Lisa to Massey's office, but parked down the street in order to avoid detection.[2]  Following the meeting, Lisa executed the second codicil to her original will.  Lisa kept a copy and gave a copy to her mother, Barbara.  According to Renee, Karen went to Barbara's house while Barbara was out and searched for the will.  Karen found the will while on the phone with Renee.  Karen advised Renee that Massey had "screwed up the will."  As a result, a new will was needed.

¶16.    While at a restaurant together, Karen informed Renee that she was going to tell Lisa that someone named "Judy" was paid by Susan to break in and steal the will and, as a result,

---

[2] Karen told Renee that Lisa was supposed to go to the appointment by herself and that Karen was not supposed to be involved.  Karen contacted Renee while Lisa was at her appointment with Massey.  When Renee found out that Karen was with Lisa, she told Karen that Karen was going to get in trouble.  Karen responded that she had parked down the street from Massey's office.

a new will needed to be prepared.[3] Karen said she wanted Munn to prepare the new will for Lisa. Karen and Lisa practiced driving to Munn's office in order to avoid the previous situation with Massey, wherein Lisa was unable to find Massey's office.

¶17. Karen confirmed to Renee that the new will had been executed and read the will to Renee. Karen told Renee she was happy that the will left Lisa's land to her and Claire, but was unhappy that the will named her as executrix, since this might indicate some involvement by Karen.

¶18. Renee testified that she spoke to Lisa after the execution of the new will. Lisa advised that when meeting with Munn, there were some words she did not understand, notably the word "coerced."

¶19. On cross-examination, Renee was asked about a letter allegedly handwritten by Lisa to Susan on May 25, 2015. In the letter, Lisa calls Susan "greedy and selfish" and asserts that Susan wanted her to change her will. When asked whether Renee had any reason to doubt that Lisa wrote the letter, Renee responded, "I have reason to doubt that Lisa manufactured those words on that paper . . . [b]ecause it's not how Lisa talked." Moreover, Renee testified that Karen had told her that she was going to "redo a letter that Susan [wa]s going to get after Lisa die[d]." Karen subsequently read the letter to Renee. After she finished reading the letter, Karen stated that she "wonder[ed] how Susan is going to feel when she gets this letter."

---

[3] During Munn's testimony, Munn stated that Lisa asked her to keep the original copy of her new will at her office since Lisa "felt like somebody had been in her house, looking around her stuff, trying to find her will, and that she would just feel better if [Munn] kept the original."

¶20. Renee further testified that when Lisa entered hospice, she contacted Nicole and asked to meet with Nicole and Susan regarding Lisa. Renee explained that things had gone "from ugly to evil," and she wanted to let them know in order to "resolve [her] guilt" since it was something she "should have done . . . sooner." Thereafter, Renee, Nicole, and Susan met and discussed Renee's concerns regarding Karen and Lisa's relationship.

¶21. Denise, who is the adopted sister of Lisa, Karen, and Susan, testified that in June 2013, she was at Barbara's house with Lisa and Karen when Karen advised that Lisa was going to make a new will. Denise stated that Karen was giving Lisa directions to the attorney's office but after a few questions, Karen just told Lisa that she would take her. Karen acknowledged that the attorney had asked Lisa to come alone, but stated "[he] won't know I'm out in the car." Denise noted that Karen's granddaughter, Hannah, was coming over for a visit and Karen did not want Hannah to know that Lisa was preparing a will.

¶22. Karen's daughter, Nicole, testified that during Mother's Day weekend 2015, she and her daughter, Hannah, traveled to Susan's house for a family get-together. Lisa was also at the party and seemed happy and relaxed. However, Nicole testified that Lisa did not want Karen to know that she was at Susan's house with Nicole and Hannah.

¶23. Karen testified that she had no involvement with the codicil prepared by Massey or the new will prepared by Munn. Interestingly, Karen testified at trial that Lisa moved in with her in August 2014, after the new will was executed. However, her previous deposition testimony revealed that Lisa had moved in with Karen in January 2014, prior to the new will's execution.

7

¶24. Following the trial, the chancellor found that a confidential and fiduciary relationship existed between Lisa and Karen. Additionally, the chancellor found there was clear and convincing evidence of a presumption of undue influence as well as of actual undue influence by Karen in the procurement of the will. The chancellor noted that Karen presented "no evidence to overcome either the presumption or the actual evidence of undue influence." As a result, the chancellor denied Karen's petition to probate Lisa's will.

¶25. Appellants[4] now appeal and argue that the chancellor erroneously denied probate.

## STANDARD OF REVIEW

¶26. We consider a chancellor's decision under a limited standard of review. *In re Will and Testament of Boyles v. Tadlock*, 990 So. 2d 230, 233 (¶9) (Miss. Ct. App. 2008). "[T]he chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." *Id*. (citations omitted). "[T]he chancellor is the sole judge of the credibility of witnesses when resolving discrepancies in a witness's testimony." *Id*. (citation omitted). "[The chancellor's] findings will not be disturbed unless this Court finds that they were made in manifest error." *Id*. (citation omitted). "In other words, where the record contains substantial credible evidence to support the chancellor's findings, we will defer to them." *Id*. (citation and internal quotations omitted). "Errors of law, however, are reviewed de novo." *Id.* (citation omitted).

## ANALYSIS

---

[4] We typically refrain from using general designations such as "Appellants." We make an exception in this case based on the difficulty involved in collectively referring to the four appellants by name.

¶27. "[A] confidential relationship arises when a dominant, over-mastering influence controls over a dependent person or trust, justifiably reposed." *Wright v. Roberts*, 797 So. 2d 992, 998 (¶17) (Miss. 2001) (citation omitted).

> Although the mere existence of confidential relations between a testator and a beneficiary under h[er] will does not raise a presumption that the beneficiary exercised undue influence over the testator[,] . . . such consequence follows where the beneficiary has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator, or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit.

*Id*. at 999 (¶21) (citation and internal quotations omitted).

> Once the circumstances give rise to a presumption of undue influence, the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence of: (1) good faith on the part of the grantee/beneficiary; (2) grantor's/testator's full knowledge and deliberation of his actions and their consequences; and (3) independent consent and action by the grantor/testator.

*Id.* at (¶23) (citation omitted).

¶28. Here, Appellants admit a confidential relationship existed between Karen and Lisa. Moreover, Appellants acknowledge that based on the evidence presented at trial, a presumption of undue influence exists. In other words, Appellants acknowledge there is a presumption that Karen exercised undue influence over Lisa. However, Appellants claim they provided clear and convincing evidence to rebut the presumption. Specifically, Appellants claim Munn's testimony was sufficient to rebut the presumption of undue influence. We disagree.

¶29. Although Munn testified regarding Lisa's knowledge and understanding of the will,

9

such testimony does not negate Renee's testimony regarding Karen's involvement and influence in the procurement of the will. Indeed, Munn had no knowledge or reason to believe that Lisa was being unduly influenced. Munn stated Lisa always drove herself to the appointments, was always alone during the appointments, and was the only person with whom she discussed the will. While this is true, Munn was unaware that Lisa lived with Karen, that Karen dictated the terms of the will, and that Karen actually practiced driving to Munn's office with Lisa. In short, the record shows Munn had no knowledge of Karen's "behind the scenes" orchestration of the procurement of Lisa's will.

¶30.  In *Croft v. Alder*, 237 Miss. 713, 729, 115 So. 2d 683, 689 (1959), the court found that testimony from the attorney who prepared the contested will did "not [negate] the presumption of undue influence resulting from 'antecedent agencies' and prior actions by the principal beneficiary who was in the confidential relation." As in *Croft*, "[w]e do not think that the testimony of [Munn] who attested the will, as to [her] observations at that particular time, can suffice to rebut the already existing presumption" since she "naturally would have had no knowledge of any precedent activities by [Karen]." *Id.* at 730, 115 So. 2d at 689.

¶31.  Appellants assert that the chancellor failed to consider the factors required to rebut the presumption of undue influence. However, the chancellor found, based on the evidence and testimony presented, that Karen lacked credibility. It is this lack of credibility, along with the testimony of Renee and various family members, that forecloses Karen's ability to overcome the presumption, as there is insufficient evidence that Karen acted in good faith.

¶32.  Moreover, the transcript shows that the chancellor was aware of the applicable factors

10

and that those factors must be shown by clear and convincing evidence to rebut the presumption of undue influence. Indeed, the chancellor gave Appellants an opportunity to "go forward with clear and convincing evidence of the elements to rebut the presumption of undue influence." However, Appellants chose to rest on the testimony of Munn.

¶33. "The 'polestar consideration' in our review of a will contest is to give effect to the intent of the testator." *Costello v. Hall*, 506 So. 2d 293, 297 (Miss. 1987) (citations omitted). "The effect of a charge of undue influence is to suggest that the will reflects the intent of the beneficiary, and not of the testator." *Id*. at 297-98. "[E]ven when a confidential relationship can be said to exist between the parties[,] . . . the beneficiary under the will must have used that relationship for h[er] personal gain or to thwart the intent of [the] testator." *Id*. at 298.

¶34. Here, the evidence indicates Karen used her confidential relationship for her personal gain and to thwart Lisa's intent. Indeed, the record shows Lisa wanted to leave her land to both Karen and Susan. However, as the result of Karen's undue influence over Lisa, Lisa's will reflects the intent of Karen, not Lisa.

¶35. Overall, we find Appellants failed to provide clear and convincing evidence to overcome the presumption of undue influence in the procurement of Lisa's will. The chancellor's findings are supported by substantial credible evidence and were not made in manifest error. Accordingly, we affirm the chancery court's judgment.

¶36. **AFFIRMED.**

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**