LEE, P.J.,
for the Court:
¶ 1. This case involves the contest of the will of Bobby Ray Finley. The contestants, Kenneth Ray Finley and Sandra Finley McCardle (collectively, “the Contestants”), are the natural son and daughter, respectively, of Bobby Ray. The proponent of the will is Jessie Daryl Finley, who is also the natural son of Bobby Ray.
¶ 2. Following hearings held on February 5-6, 2008, and June 25, 2008, the Perry County Chancery Court entered a judgment in favor of Jessie, finding that Bobby Ray possessed the testamentary capacity necessary to create a valid will and also finding that Bobby Ray’s will was not a result of undue influence.
FACTS
¶ 3. Bobby Ray passed away on April 18, 2005. He was preceded in death by his wife, Avis Finley, and survived by the Contestants and Jessie. In 1984, Bobby Ray and Avis executed similar wills, leaving their respective estates to each other or to the three children equally should they not survive each other. Avis was killed in an automobile accident in April 2001, leaving her estate to Bobby Ray.
¶ 4. After Avis’s death, Jessie quit his job as a trucker, and with his wife, Rachel, Jessie moved in with Bobby Ray to help take care of him. Jessie and Rachel also helped run the family chicken-house operation, from which they produced eggs for Sanderson Farms. In the 1980s, Bobby Ray was injured when a tractor fell on him, and he never fully recovered physically. As a result, he was unable to carry out *689 the physical aspect of running the chicken-house operation on his own.
¶ 5. In August 2001, after Avis’s death, Bobby Ray executed a deed to 70.95 acres, the family home, and the chicken houses to Jessie, reserving unto himself a life estate. In November 2001, Bobby Ray deeded 57.45 acres to Jessie and Kenneth, again reserving a life estate for himself. In December 2001, Bobby Ray executed an additional deed to this property, granting a full interest in the land to Kenneth. The December 2001 deed, however, did not contain the reservation of a life estate.
¶ 6. Due to beetles infecting the pine trees located on this acreage, Bobby Ray sought to have the timber cut. When attempting to sell the timber, Bobby Ray learned that he had mistakenly failed to retain a life estate in the land, and he had instead granted a full interest in the land to Kenneth. Bobby Ray requested that Kenneth grant him a life estate in the land, but Kenneth refused. Eventually, in August 2002, Kenneth acquiesced and granted a life estate in the property back to his father.
¶ 7. On December 30, 2002, Bobby Ray rewrote his last will and testament. In his final will, Bobby Ray left the 57.45 acres to Kenneth; $20,000 to Sandra; and 2.60 acres, his home, all contents of his home, 75.6 acres of land, all of the chicken houses and equipment on the farm to Jessie. Bobby Ray also left $5,000 in a trust for his granddaughter, Danielle Gilmore, and $10,000 to his sister, Braddis Finley Crocker, and her husband.
¶ 8. The Contestants filed suit against Jessie, alleging that Bobby Ray’s will, in which he left the bulk of his estate to Jessie, was the result of undue influence. The Contestants also asserted that Bobby Ray lacked the requisite testamentary capacity necessary to execute a will. After three days of testimony from seventeen witnesses, the chancellor found that Bobby Ray possessed the mental competency to execute a will in 2002. The chancellor also found that the record did not support a finding of undue influence. On appeal, the Contestants argue the following: (1) the chancellor erred by applying the wrong burdens of proof, and (2) the chancellor erred in determining that no undue influence occurred in the creation of the will or execution of the deeds.
STANDARD OF REVIEW
¶ 9. “This Court will not disturb a chancellor’s findings of fact in a will contest unless the findings are clearly erroneous, manifestly wrong, or the chancellor applied an incorrect legal standard.” In re Estate of Thornton v. Thornton, 922 So.2d 850, 852 (¶ 6) (Miss.Ct.App.2006). However, we apply a de novo standard of review to questions of law. Id.
DISCUSSION
I. BURDEN OF PROOF
¶ 10. In the first issue on appeal, the Contestants argue that the chancellor applied the wrong burden of proof; thus, we should reverse and remand. Specifically, the Contestants allege that the chancellor erred by stating in the judgment that the burden of proof shifts to the Contestants to establish the lack of testamentary capacity and undue influence after the proponent has made his prima facie case as to the validity of the will. The Contestants submit that the burden of proof at trial remains upon the proponent, Jessie, to prove the validity of the will. Citing Miss. Code Ann. § 91-7-29 (Rev.2004).
¶ 11. “The law in [Mississippi] on fiduciary or confidential relationships and undue influence is well settled.” Howell v. May, 983 So.2d 313, 317 (¶ 14) (Miss.Ct.App.2007) (citation omitted). We also *690 point out that “[i]ts application has been made to both inter vivos and testamentary-transactions.” Id. (citation omitted). The Contestants cite Clardy v. National Bank of Commerce, 555 So.2d 64, 66 (Miss.1989), where the supreme court set forth that the burden of proof in will contests never shifts from the proponents to the contestants, but only the burden of production shifts to the contestants once the proponent has made a prima facie case. However, the supreme court in Clardy recognized that chancellors may at times say one thing when they mean another. The supreme court stated: “Where it is apparent from the record that the court understood the burdens and applied them faithfully, we will not reverse for a slip of the tongue or ambiguity of comment from the bench.” Id. at 67.
¶ 12. In his judgment the chancellor does state that “the burden of proof then shifted to the opponents of the will to establish lack of capacity and undue influence in the creation of the will.” However, in reading the chancellor’s entire judgment, it is apparent that he understood the burdens and applied them faithfully. In his judgment, the chancellor states the following: “From the evidence presented the Court finds the proponents of the [will] have met the burden of proving the validity of the will with the contestants then having the burden of going forward with evidence sufficient to challenge the will.” The chancellor then cited In re Estate of Pigg v. McClendon, 877 So.2d 406 (Miss.Ct.App.2003). The chancellor’s statement directly follows this Court’s language in McClendon concerning the proper burden of proof. Id. at 409 (¶ 8). The chancellor clearly understood the proper burden of proof.
¶ 13. This is not a situation where the chancellor repeatedly stated the incorrect burden of proof. To reverse in this situation would allow appellate courts to reverse a chancellor any time he or she makes one innocent “slip of the tongue.” After reviewing the record, we cannot find that the chancellor improperly placed the burden of proof on the contestants; thus, this issue is without merit.
II. UNDUE INFLUENCE
¶ 14. In their other issue on appeal, the Contestants argue that the chancellor erred by finding that no undue influence existed in the creation of Bobby Ray’s will and deeds to his land. The Contestants submit that a confidential relationship existed between Bobby Ray and Jessie, and they assert that the existence of such a relationship would increase Jessie’s burden of proof at trial.
¶ 15. As previously stated, Mississippi law regarding confidential relationships and undue influence applies to both inter vivos and testamentary transactions. Howell, 983 So.2d at 317 (¶ 14). However, the Mississippi Supreme Court has created a distinction between inter vivos gifts and testamentary gifts on the matter of confidential relationships. In Madden v. Rhodes, 626 So.2d 608, 618 (Miss.1993), the supreme court noted that in an action for a will contest, if a confidential relationship exists, a presumption of undue influence arises only when there has been an abuse of that confidential relationship. However, with inter vivos gifts, if a confidential relationship exists, “there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.” Id. The burden rests on the party seeking to set aside the inter vivos gift to demonstrate by clear and convincing evidence that a confidential relationship existed between the grantor and grantee, thus creating a rebuttable presumption of undue in *691 fluence. Howell, 983 So.2d at 318 (¶¶ 14-16). -
¶ 16. In establishing the validity of an inter vivos gift or testamentary gift, the supreme court has enumerated several factors to consider in determining whether a confidential relationship exists:
(1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
In re Dabney v. Hataway, 740 So.2d 915, 919 (¶ 12) (Miss.1999). “With both gifts testamentary and gifts inter vivos, once the presumption of undue influence has been established, the burden of proof shifts to the beneficiary/grantee to show by clear and convincing evidence that the gift was not the product of undue influence.” Wright v. Roberts, 797 So.2d 992, 998 (¶ 16) (Miss.2001).
¶ 17. In sum, if a confidential relationship exists between Bobby Ray and Jessie, the inter vivos gift — here, the deeds to the Bobby Ray’s land — is presumptively invalid. In re Reid v. Pluskat, 825 So.2d 1, 5 (¶ 13) (Miss.2002). In turning to the testamentary gifts, if a confidential relationship is established, and the Contestants show an abuse of that confidential relationship by Jessie, the testamentary gifts, which include Bobby Ray’s land and money, are also presumptively invalid due to undue influence. Id. at (¶ 14). Jessie must rebut the presumptions of undue influence relating to the inter vivos gift and testamentary gifts by clear and convincing evidence. To overcome the presumption of undue influence, the proponent of the will or gift must show the following: “(1) good faith on the part of the grantee/beneficiary; (2) grant- or’s/testator’s full knowledge and deliberation of his actions and their consequences; and (3) independent consent and action by the grantor/testator.” Wright, 797 So.2d at 999 (¶ 23).
¶ 18. In regard to whether a confidential relationship existed between Jessie and Bobby Ray, we find that the Contestants have failed to establish such relationship existed. The Contestants make the following assertions regarding Bobby Ray’s mental capacity. Bobby Ray had suffered severe injuries in an accident several years before his wife died, and he depended on various medications to ease his pain, including a morphine pump. Numerous witnesses testified that Bobby Ray’s health deteriorated after his wife died, and that he needed Jessie’s help to run the physical aspects of the chicken-house operation. Jessie and his wife, Rachel, lived with Bobby Ray after his wife died. Jessie and Rachel helped Bobby Ray around the house, and Rachel cooked diabetic-friendly meals for him. When Jessie began helping run the chicken farm, Bobby Ray added his name to the business bank account. The Contestants assert that this evidence is clear and convincing to establish a confidential relationship.
¶ 19. However, the Contestants disregard any evidence to the contrary. Several witnesses testified that although Bobby Ray was physically challenged, he was a shrewd businessman, was able to negotiate contracts, and was a good manager of the chicken farm. Several witnesses testified that Bobby Ray did not solely depend upon Jessie and Rachel. Bobby Ray’s pharmacist testified that he only ever saw Bobby Ray pick up his medication and that patients who have been on controlled *692 amounts of morphine can function properly. Bobby Ray was capable of driving himself and often traveled to his camp in Waynesboro. There was also testimony that Bobby Ray often rode his four-wheeler and drove himself to Hattiesburg when he needed his morphine pump refilled. Two witnesses testified that Bobby Ray controlled his medication, keeping it near him in a cigar box and administering the medications himself. Several witnesses discussed Bobby Ray’s mental capacity, stating that he was not easily influenced, preferred to make up his own mind about things, and always did what he felt was right. The court-appointed accountant testified that there was no misuse of business funds by Jessie. Rachel testified that although she maintained the books for the chicken farm, Bobby Ray signed the checks and reviewed each bank statement.
¶ 20. There was scant evidence regarding Bobby Ray’s will. Bobby Ray arrived by himself to sign the will, and the witnesses testified that he was acting like normal and knew what he was doing. There was no evidence that Bobby Ray did not drive himself or have the will prepared himself.
¶21. Testimony showed that Bobby Ray changed his will because he was disappointed with Kenneth and Sandra. Kenneth testified that Bobby Ray was depressed after his wife died and appeared to be disoriented at times. However, Kenneth admitted that he only visited Bobby Ray once a month, and those visits gradually stopped. Sandra testified that Bobby Ray had told her he was leaving his land to Jessie and Kenneth, but that he was leaving her some money. Although Sandra also testified that Bobby Ray was never left alone, Sandra admitted that sometimes she was only able to visit once a week. James Thomas Finley, Bobby Ray’s brother, testified that Bobby Ray confided in him that he was considering leaving Kenneth and Sandra out of his will. Bobby Ray purportedly told James Thomas that Kenneth and Sandra had treated him badly, and he was angry with them. Kenneth admitted that Bobby Ray was angry with him.
¶ 22. Braddis, Bobby Ray’s sister, testified that she visited Bobby Ray almost every day. Braddis confirmed that Bobby Ray was depressed after his wife died, but that he remained mentally strong. Brad-dis testified that Bobby Ray spoke to her at one time about his will and stated that he was “making up his mind as to what he was [going] to do.” At another time he told Braddis that he was angry with Kenneth and Sandra and said he was changing his will. Braddis testified that she watched Bobby Ray take his own medicine. Mary Helen Guy, Bobby Ray’s cousin, testified that Bobby Ray had told her he had thought about whether or not to leave Kenneth and Sandra anything in his will. Mary Helen testified that Bobby Ray later told her that he had decided to leave each one something.
¶ 23. The chancellor determined that there was no evidence to show that Bobby Ray lacked the capacity to execute a legal document. The chancellor noted that much of the evidence put on by the Contestants consisted of speculation and assumptions that because Bobby Ray lived with Jessie a confidential relationship automatically arose. The evidence presented at trial was insufficient to show that a confidential relationship existed; thus, it is not necessary for us determine whether Bobby Ray was unduly influenced. This issue is without merit.
¶ 24. THE JUDGMENT OF THE PERRY COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*693 MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J.