983 So.2d 313 (2008)
Sharnee M. HOWELL and Chester Lee Howell "C.L." Howell, Appellants/Cross-Appellees,
v.
Pat MAY, Clayton May and Josie May Tidwell, Appellees/Cross-Appellants.
No. 2005-CA-02259-COA.
Court of Appeals of Mississippi.
June 19, 2007.
Rehearing Denied January 29, 2008.
*315 Thomas Henry Freeland, Charlie Gaines Baker, attorneys for appellants.
Phil R. Hinton, Corinth, attorney for appellees.
Before KING, C.J., IRVING AND ROBERTS, JJ.
*316 ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This appeal originates from a chancellor's decision to set aside an inter vivos gift and to decline to set aside other inter vivos gifts. During her lifetime, Ann May deeded her home to her daughter, Sharnee Howell. Ann also gave Sharnee a $6,000 cash gift. Further, Ann gave Sharnee's two children $5,000 each. After Ann died, Sharnee's siblings sued and sought to set aside the deed and the cash gifts. The chancellor found that Sharnee had a confidential relationship with Ann and that Sharnee failed to adequately rebut the presumption of undue influence that resulted. Accordingly, the chancellor set aside Ann's deed to Sharnee. The chancellor did not set aside Ann's inter vivos cash gifts to Sharnee, Christy, or Chad. Sharnee appeals and the Mays cross-appeal. Finding no error, we affirm the chancellor's decision to set aside the deed. We also affirm the chancellor's decision to uphold Ann's cash gifts to her grandchildren and to Sharnee.

FACTS
¶ 2. This is a family dispute among siblings. Joe and Ann May were married for fifty-three years. They had four children  Sharnee, Pat, Clayton, and Josie.
¶ 3. Ann suffered from a number of ailments which required that she have daily assistance. Among other ailments, Ann suffered from osteoporosis, heart disease, kidney and bladder problems, pinched nerves, ruptured disks, and cataracts. Ann did not drive. She used a walker and, on occasion, a wheelchair. Joe assisted Ann with her daily activities until he passed away on September 18, 1999.
¶ 4. Approximately three months after Joe died, Sharnee and her family moved into Ann's home. By all accounts, Sharnee helped Ann perform her daily activities. Sharnee drove Ann to and from appointments with her doctors. Sharnee helped Ann convert her two individual bank accounts to joint accounts with rights of survivorship. According to Sharnee, Ann converted the accounts so that, in the event that Ann became unable to pay her bills, Sharnee could do so.
¶ 5. During April of 2000, Ann modified her estate. Approximately four months after Sharnee and her family moved in with Ann, Sharnee arranged an appointment for Ann to meet with attorney Eddie Hannaford, Jr. Hannaford had previously conducted loan closings for Sharnee. On April 11, 2000, Sharnee drove Ann to Hannaford's office. Sharnee and Ann met with Hannaford and, as a result of that meeting, Hannaford prepared some estate planning documents for Ann.
¶ 6. Two days later, Sharnee again drove Ann to Hannaford's office. Again, Sharnee and Ann met with Hannaford. Hannaford presented Ann with a will, a deed, a general power of attorney, and a durable power of attorney for health care. According to the will, Ann would leave all of her property, except a 1982 pickup truck, to Sharnee. Pursuant to the deed, Ann reserved a life estate in her property and otherwise transferred her real property, including her home, to Sharnee. As for the general power of attorney, by that document, Ann named Sharnee as her attorney in fact. Hannaford left Ann and Sharnee in his office so they could review the documents. Ultimately, Ann executed the deed, the will, and the two powers of attorney.
¶ 7. During February of 2003, Ann fell. She was bedridden from that point. Shortly afterwards, Ann was diagnosed with cancer. During the time that Ann was bedridden, she gave Sharnee $6,000 in cash. On the Thursday before Ann died, *317 Ann gave Christy and Chad each $5,000. Ann passed away on Sunday, April 27, 2003. According to Sharnee, Ann told her that she wanted her to have her wedding rings set after she died. Sharnee received Ann's wedding ring after Ann's funeral.

PROCEDURAL HISTORY
¶ 8. On October 6, 2003, the Mays filed suit in the Tate County Chancery Court. They sought to have Ann's inter vivos gifts to Sharnee set aside. The Mays later amended their complaint, added Sharnee's husband, C.L., and Sharnee's children, Chad and Christy, as defendants. By their amended complaint, the Mays requested that the chancellor set aside any of Ann's inter vivos gifts to Chad and Christy.
¶ 9. On April 30, 2004, the Howells responded to the amended complaint and filed a counter-complaint. By their counter-complaint, the Howells alleged that the Mays' complaint and amended complaint: (a) contained "numerous false, frivolous, and misleading allegations." (b) lacked "substantial justification," (c) was "groundless in fact and law, frivolous and/or vexatious in nature," and (d) was intended "to continue a course of intentional or reckless infliction of emotional distress" against them. Finally, the Howells claimed that the Mays, by their complaint and amended complaint, violated the Litigation Accountability Act of 1988 and M.R.C.P. 11(b).
¶ 10. The Mays responded to the Howells' counter-complaint and the matter proceeded to trial. Trial commenced on June 2, 2005, and continued through the next day.
¶ 11. On September 26, 2005, the chancellor rendered his opinion. The chancellor found that there was a confidential relationship between Ann and Sharnee but not between Ann and Sharnee's children. As such, the chancellor found that a rebuttable presumption of undue influence arose regarding Ann's inter vivos gifts to Sharnee, but not to Ann's gifts to Chad and Christy.
¶ 12. The chancellor then found that Sharnee failed to rebut the presumption of undue influence by clear and convincing evidence. As for Ann's wedding ring, the chancellor found that there was no evidence that Ann gave Sharnee her wedding rings during Ann's lifetime. Accordingly, the chancellor (a) set aside the deed to Sharnee, (b) set aside the inter vivos gift of Ann's wedding ring, (c) upheld Ann's $6,000 cash gift to Sharnee, and (d) upheld Ann's inter vivos cash gifts to Chad and Christy. On November 4, 2005, the chancellor filed his judgment. The Howells appeal the chancellor's decision to set aside the deed. The Mays cross-appeal and claim that the chancellor erred when he declined to set aside Ann's cash gifts to Sharnee, Chad, and Christy.

STANDARD OF REVIEW
¶ 13. We will not disturb a chancellor's findings of fact unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard. Wright v. Roberts, 797 So.2d 992 (¶ 14) (Miss. 2001). Moreover, we will not reverse if the chancellor's findings are supported by substantial, credible evidence in the record. Id.

ANALYSIS
I. WHETHER THE CHANCELLOR ERRED WHEN HE SET ASIDE THE DEED.
¶ 14. "The law in this state on fiduciary or confidential relationships and undue influence is well settled." Wright, 797 So.2d at 998 (¶ 16). "Its application has been made to both inter vivos and testamentary transactions." Id. In application *318 to inter vivos gifts, the question is generally a two-step process involving shifting burdens of proof. As for the first step, the burden is on the plaintiff who seeks to have a chancellor set aside an inter vivos gift. If a plaintiff can demonstrate, by clear and convincing evidence, the existence of a confidential relationship between a grantor and a defendant grantee, a rebuttable presumption of undue influence arises regarding any inter vivos transactions between the grantor and the defendant grantee. Id. at (¶ 21). Accordingly, our first inquiry is whether there was a confidential relationship between the grantor of the deed, Ann, and the grantee, Sharnee.
¶ 15. To determine whether a confidential relationship exists, the following factors should be considered:
(1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
Id. at (¶ 18). The chancellor found that Sharnee had a confidential relationship with Ann. In fact, Sharnee conceded that she had a confidential relationship with Ann.
¶ 16. "[O]nce the presumption of undue influence has been established, the burden of proof shifts to the beneficiary/grantee to show by clear and convincing evidence that the gift was not the product of undue influence." Id. To rebut the presumption of undue influence, Sharnee was obligated to prove, by clear and convincing evidence, (a) good faith on her part; (b) Ann's full knowledge and deliberation of her actions and the consequences of her actions; and (c) independent consent and action by Ann. Wright, 797 So.2d at 999 (¶ 23). Sharnee submits that the chancellor was manifestly wrong when he did not find that she rebutted the presumption of undue influence by clear and convincing evidence. Naturally, the Mays contend that the chancellor's findings were supported by substantial, credible evidence and that, as such, this Court is bound to affirm.
A. Good Faith.
¶ 17. Sharnee submits that she submitted clear and convincing evidence of good faith. Important factors for this Court to consider in determining whether a grantee or beneficiary acted in good faith are:
(a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.
Id. at 1000 (¶ 24).
¶ 18. The chancellor found that, based on testimony from Ann's sister, Marvelene Pope, Sharnee told Ann that she wanted Ann's house. It is undisputed that Sharnee set up Ann's appointment with Hannaford. However, there is some dispute as to whether Ann specifically requested Hannaford or whether Sharnee settled on Hannaford with no input from Ann. Regardless, there is no dispute as to the place of execution and in whose presence execution took place. Sharnee transported Ann to Hannaford's office on both April 11, 2000 and April 13, 2000. Sharnee was present *319 when Ann met with Hannaford on both dates. On April 13, 2000, Hannaford left the room so Ann could review the documents she requested. When Ann reviewed the documents, Sharnee was the only person with her. Sharnee was also present when Ann executed the documents.
¶ 19. As to the consideration factor of our analysis, consideration may be defined as "[s]ome right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." BLACK'S LAW DICTIONARY 306 (6th ed.1990). Sharnee submits that Ann deeded her home to Sharnee as consideration for Sharnee's caring for Ann after Joe died. Sharnee also testified that she never expected Ann to give her the house and that she did not take care of Ann pursuant to some agreement that she would receive the house. In fact, during cross-examination, counsel for the Mays asked Sharnee, "There was no agreement. It wasn't that you were trading things, services for her property, was it?" Sharnee responded, "No, sir."
¶ 20. The evidence does not suggest that Ann's decision to deed her house to Sharnee was necessarily a secret, per se. However, a reasonable person could find that Ann's decision was not necessarily "open." Not one of Ann's siblings or her children, except Sharnee, knew that Ann planned to deed her home to Sharnee until after the fact. Rather, the Mays discovered the deed during the last months of Ann's life-two years and ten months after the fact. Several months after the April 13th deed, Ann's sister, Marvelene Pope, learned that Ann did "something" with her property. Marvelene thought that Ann intended to leave Sharnee the house pursuant to her will. That is, Marvelene did not know that Ann deeded her home to Sharnee. Ann's brother, Jim Wolfe, only learned about the deed when, at Ann's request, he took Ann to Hannaford's office so that she could undo the April 13, 2000 will in which she left everything but a truck to Sharnee.
¶ 21. Considering the foregoing, we find that the chancellor's decision was supported by substantial evidence. As such, we affirm the chancellor's decision that Sharnee failed to demonstrate good faith by clear and convincing evidence.
B. Ann's Full Knowledge and Deliberation of Her Actions and Consequences of Those Actions.
¶ 22. In considering the second prong under the test to determine whether the Howells rebutted the presumption of undue influence, this Court should consider the following important factors:
(a) [the grantor's] awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
Wright, 797 So.2d at 1001 (¶ 31).
¶ 23. A reasonable interpretation of the testimony indicates that Ann did not understand how her April 13th documents, including the deed, affected the distribution of her estate. On April 13th, Ann deeded her property to Sharnee and reserved a life estate. Additionally, Ann executed a will and left nearly all of her *320 property to Sharnee. However, according to Sharnee, Ann did not intend for Sharnee to keep all of Ann's property. Instead, Sharnee testified that Ann really intended that Sharnee distribute Ann's property pursuant to some verbal agreement that is not particularly specified in the record. That is, Sharnee testified that Ann left Sharnee everything so that Sharnee could distribute it according to Ann's wishes, whatever they purportedly were. During the summer of 2002, Ann told her brother, Jim Wolfe, that she did not remember leaving Sharnee everything in her will. Ann asked Wolfe to take her to Hannaford's office so that she could remedy the contents of her will. However, Ann's April 13th will is not at issue. For our present purposes, the relevant transfer is the April 13th deed.
¶ 24. While Ann's April 13th will is not at issue, evidence suggests that, during her discussions with Hannaford regarding remedying her will, Ann expressed dissatisfaction with the April 13th deed. According to Wolfe's testimony, Hannaford told Ann that she could not revoke her deed to Sharnee without Sharnee's consent. Wolfe testified that Ann "wasn't satisfied" when she heard that she could not change the fact that she deeded the property to Sharnee. It appears that Ann asked Sharnee to deed the house back to her, because Wolfe testified that Sharnee refused to deed the house back to Ann. According to Wolfe, Sharnee refused because she had "too much money tied up in the house." As such, we must find that substantial evidence supported the chancellor's finding that Sharnee failed to demonstrate that Ann fully understood the consequences of her actions.
C. Independent Consent and Action by Ann.
¶ 25. Under the third prong of the test to rebut the presumption of undue influence, Sharnee was obligated to demonstrate, by clear and convincing evidence, that Ann exhibited independent consent and action. Wright, 797 So.2d at 1002 (¶ 38). The "best way" to show independent consent and action is to provide advice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interests. Dean v. Kavanaugh, 920 So.2d 528, 537 (¶ 46) (Miss.Ct.App.2006).
¶ 26. We find that the chancellor's decision was supported by substantial evidence. There was no evidence that Ann received advice from anyone when she deeded her home to Sharnee. True enough, Ann met with Hannaford, but there was no testimony that Hannaford gave Ann any advice as to the distribution of her assets. Hannaford testified that he could not remember whether Ann requested specific documents or whether Ann told him what she wanted to accomplish and he suggested certain documents. That is, Hannaford did not remember giving Ann advice at all. Sharnee testified that Hannaford did not give Ann advice when Ann first visited Hannaford. Instead, Sharnee testified that Ann told Hannaford what she wanted and Hannaford complied. Further, substantial evidence suggests that Sharnee participated during the April 2000 meetings with Hannaford. "The participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action." Id. (quoting Harris v. Sellers, 446 So.2d 1012, 1015 (Miss.1984)).

THE ISSUES ON CROSS-APPEAL
I. SHOULD THE CHANCELLOR HAVE AWARDED THE MAY CHILDREN OR THE ESTATE OF ANN MAY, A JUDGMENT *321 AGAINST SHARNEE M. HOWELL FOR A $6,000 INTER VIVOS GIFT SHE RECEIVED DURING THE LAST FEW MONTHS OF ANN'S LIFE?
¶ 27. As with the issue on appeal, there is no dispute on cross-appeal as to whether there was a confidential relationship between Ann and Sharnee. The Mays did not specifically ask the chancellor to set aside the $6,000 cash gift in either their complaint or their amended complaint. The Mays did ask the chancellor to set aside "all inter vivos conveyances" from Ann to Sharnee. The $6,000 inter vivos cash gift certainly falls within that category. However, the chancellor did not discuss Ann's $6,000 cash gift to Sharnee in either his opinion or his judgment. It is unclear just why the chancellor did not address this inter vivos gift.
¶ 28. In any event, we find that the Mays waived this issue when they failed to request special findings from the chancellor. "In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly." M.R.C.P. 52(a). By failing to request special findings regarding Ann's cash gift to Sharnee, the Mays waived the issue on appeal. Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co., 728 So.2d 573, 579 (¶ 21) (Miss.1999).
II. SHOULD THE CHANCELLOR HAVE AWARDED THE MAY CHILDREN OR THE ESTATE OF ANN MAY, A JUDGMENT AGAINST SHARNEE M. HOWELL FOR A $10,000 INTER VIVOS GIFT MADE TO MRS. HOWELL'S CHILDREN JUST THREE DAYS BEFORE HER DEATH?
¶ 29. The Mays contend that the chancellor erred when he did not set aside Ann's cash gifts to Sharnee's children, Chad and Christy. According to the Mays, the chancellor should have set aside Ann's inter vivos gifts to Chad and Christy due to the confidential relationship between Ann and Sharnee. That is, the Mays do not contend that there was a confidential relationship between Ann and Sharnee's children. Instead, the Mays claim that Ann's cash gifts to her grandchildren should be set aside solely as a product of Ann's relationship with Sharnee. We have discussed the appropriate analysis and the relevant law above. For brevity's sake, we will not restate it here.
¶ 30. There is no evidence that Sharnee in any way convinced or otherwise influenced Ann's decision to give Chad and Christy the $5,000 gifts. Considering the lack of evidence of any form of undue influence, we are not prepared to invalidate a grandmother's inter vivos gift to two of her grandchildren. Accordingly, we affirm.

CONCLUSION
¶ 31. Substantial evidence supported the chancellor's finding that Ann failed to rebut the presumption of undue influence regarding the April 13th deed by clear and convincing evidence. As for Ann's gifts to Chad and Christy, we do not find that those gifts resulted from any form of undue influence by Sharnee, and there is no claim that Chad and Christy had a confidential relationship with Ann. As for Ann's $6,000 gift to Sharnee, we find that this issue is not properly preserved for appeal.
¶ 32. THE JUDGMENT OF THE TATE COUNTY CHANCERY COURT ON DIRECT APPEAL AND CROSS-APPEAL IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO *322 THE APPELLANTS/CROSS-APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.