# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00835-COA

**JEFFREY VAN QUINN**                                      **APPELLANT**

**v.**

**SHADE LARUE QUINN**                                      **APPELLEE**

DATE OF JUDGMENT:              06/15/2017
TRIAL JUDGE:                   HON. FRANKLIN C. MCKENZIE JR.
COURT FROM WHICH APPEALED:     JONES COUNTY CHANCERY COURT,
                               SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:       TERRY L. CAVES
                               RISHER GRANTHAM CAVES
ATTORNEY FOR APPELLEE:         S. CHRISTOPHER FARRIS
NATURE OF THE CASE:            CIVIL - REAL PROPERTY
DISPOSITION:                   AFFIRMED: 01/31/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**GRIFFIS, C.J., FOR THE COURT:**

¶1.     Jeffrey Van Quinn appeals the chancellor's denial of his complaint to set aside certain deeds signed by his late father, Earl Quinn, based on undue influence and a lack of mental capacity.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Earl suffered numerous medical ailments, including depression.  Earl's grandson, Shade Larue Quinn, along with Bonnie Steadham, assumed the role of Earl's primary care givers when his condition worsened.  Earl required a feeding tube, numerous medications, and assistance to stand and walk.  In January 2016, Shade moved in with Earl to care for him

full-time.

¶3.    Earl owned the following property:

   a.    166 acres of timberland in Jones County, Mississippi;

   b.    Five rental properties in Jones County, located at: 4413 Creek Avenue, 4411 Creek Avenue, 4407 Creek Avenue, 4415 Creek Avenue, and 832 Choctaw; and

   c.    His home, located at 4420 Creek Avenue, in Laurel.

¶4.    On January 22, 2016, Earl asked Shade to take him to attorney Danny Henson's office. Earl chose Hanson because of his paralegal, Nita Tolbert. Earl always used the attorney who employed Nita. While there, Earl signed three warranty deeds. Two of the deeds transferred his interest in the timberland and the five rental properties to Shade. The other deed transferred Earl's interest in his home to his son, Terry Quinn. All of the deeds were recorded that day, and Shade placed the deeds in Earl's safety deposit box. Six days later, Earl took his own life.

¶5.    Jeffrey, Earl's son, filed a complaint to set aside only the deeds that conveyed property to Shade. Jeffrey did not assert a claim to set aside the deed that conveyed Earl's home to Terry. Jeffrey claimed that Earl was unduly influenced by Shade and that Earl did not have the mental capacity to appreciate the consequences of his actions.

¶6.    At trial, the chancellor heard testimony that Earl loved Shade and considered Shade his "heart." Moreover, Earl wanted to provide for Shade through numerous versions of his will. The chancellor also heard expert testimony from Dr. Mark Horne, an internist, who had

never treated or met with Earl. Dr. Horne opined that Earl was mentally incapacitated and heavily medicated. His expert testimony focused on Earl's medical incapacity, not Earl's legal ability to transfer property to Shade in a deed.

¶7. The chancellor found that Earl made a conscious decision to transfer interest in the property to Shade. The chancellor determined that Earl always intended that the timberland go to Shade and that the additional five properties were transferred freely and without undue influence.

¶8. Jeffrey appeals the chancellor's judgment. We find no error and affirm.

## STANDARD OF REVIEW

¶9. "A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard." *Wright v. Roberts*, 797 So. 2d 992, 997 (¶14) (Miss. 2001). "If the [c]hancellor's findings are supported by substantial, credible evidence in the record, this Court will not reverse." *Id*.

## ANALYSIS

I. *Whether the chancellor erred in finding that Shade rebutted the presumption of undue influence.*

¶10. The chancellor determined that a confidential relationship existed between Earl and Shade. Because a presumption of undue influence existed, the burden of proof shifted to Shade to show by clear and convincing evidence that the gift was not the product of undue influence. *Id*. at 998 (¶16). To rebut the presumption, Shade had to prove by clear and convincing evidence: (1) that he acted in good faith, (2) that Earl had full knowledge and

3

deliberation of his actions and their consequences, and (3) that Earl exercised independent consent and action. *Id*. at 999 (¶23).

### A. Good Faith

¶11. To determine whether Shade acted in good faith, the court must consider the following factors:

> (a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.

*Id*. at 1000 (¶24).

¶12. Jeffrey relies on *Howell v. May*, 983 So. 2d 313, 316 (¶1) (Miss. Ct. App. 2007), where this Court considered a disagreement among siblings over gifts given by their mother to one sibling but not the others. We affirmed the chancellor's decision that Sharnee Howell failed to demonstrate good faith by clear and convincing evidence. *Id.* at 319 (¶21).

¶13. Jeffrey points to the factual similarities between *Howell* and this case. There, Sharnee took her mother to see an attorney many times before her mother deeded her property to Sharnee. *Id*. at 316 (¶¶5-6). Here, just like Sharnee, Shade took Earl to the attorney's office and stayed there with him. However, Sharnee specifically asked for the property she received, i.e., her mother's home. *Id.* at 318 (¶18). Sharnee then set up every appointment with her mother's attorney and was alone with her mother to review the deeds. *Id*. Here, the facts are different, Shade did not ask for the property he was given, and there is no indication

4

that he ever reviewed the deeds alone with Earl. Although Shade may have taken Earl to Henson's office, it was at Earl's insistence. The record shows that Shade did not speak during the meetings between attorney Henson and Earl. Shade was only present at the request of his grandfather. Moreover, Earl paid for Henson's time and legal work.

¶14. The record further shows that, even before he began to feel the effects of his age, Earl intended for Shade to get a majority of his property. There was evidence that, in every draft of his will from 2013 until 2016, Earl allocated at least his timberland to Shade.

¶15. We find no error as to the chancellor's determination of Shade's good faith.

> B. *Earl's Full Knowledge and Deliberation of His Actions and Their Consequences*

¶16. At trial, both Bonnie Steadham and Shade were adamant that Earl did whatever he wanted with his property. In fact, Earl went through many drafts of his wills because he would remove individuals after he had arguments with them. Jeffrey, on the other hand, argues that his father was mentally incapable of properly disposing of his property. Here, the following factors must be considered:

> (a) [The grantor's] awareness of his total assets and their general value,
>
> (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution,
>
> (c) whether non-relative beneficiaries would be excluded or included[,] and[]
>
> (d) knowledge of who controls his finances and business and by what

5

method, and if controlled by another, how dependent is [the grantor] on him and how susceptible to his influence.

*Wright*, 797 So. 2d at 1001 (¶31).

¶17. Testimony clearly indicated that Earl was aware of and familiar with his property. There was no evidence that Earl was aware of the property's general value; yet, that does not mean Earl was incapable of knowing the consequences of his actions when he deeded the property to Shade. Earl had the ability to distribute the rest of his property in every will he had drafted. Earl spoke with Henson about the reservation of a life estate in his property and what that meant. Earl even transferred, by deed, his home to his son Terry. Jeffrey does not dispute this conveyance. Thus, Jeffrey does not question Earl's mental competency regarding his decision to transfer property to Terry. Instead, Jeffrey only disputes Earl's competency as to his decision to transfer property to Shade. We recognize that Jeffrey's claim as to this factor is inconsistent – Earl was mentally competent to deed property to his son Terry but not mentally competent at the same time to deed property to his grandson Shade.

¶18. There was also evidence that Earl also understood his finances. Although Earl could not physically write his checks because his hands shook, Earl was still mentally capable to ask Bonnie to handle most of his bills at home.

¶19. We find no error as to the chancellor's determination that Earl had full knowledge and deliberation of his actions and their consequences.

C.      *Independent Consent and Action by Earl*

6

¶20. The record supports the chancellor's findings regarding independent consent and action by Earl. Indeed, the record shows that Earl's intent was to always provide for Shade in his will. According to Bonnie, Earl told her before he died what he wanted to do with his property:

> Earl would sit and think about what all he had. And how much he loved Shade and that Shade was going to be taken care of. He was going to take care of Shade. So he decided - he . . . was going to sell the [rental] houses . . . and then he would say no, I'm not going to sell the [rental] houses. So he decided he was going to give Shade the [rental] houses.

¶21. We find no error as to the chancellor's determination that Shade rebutted the presumption of undue influence.

> II.     *Whether the chancellor erred in finding that Earl did not suffer from a lack of mental capacity.*

¶22. Jeffrey next argues that Earl was mentally incapable and could not transfer the property in accordance with the laws of this State. Because Jeffrey questioned his father's mental capabilities, he was required to prove by clear and convincing evidence that Earl was incapable of properly executing the deed. *Richardson v. Langley*, 426 So. 2d 780, 783 (Miss. 1983).

¶23. To prove incapacity, Jeffrey was required to show that Earl either: (1) did not understand the legal consequences of his actions; (2) suffered from a general "weakness of intellect" with either inadequate consideration given for the transfer, or a confidential relationship; or (3) suffered from permanent insanity up to and after the date of execution. *Smith v. Smith*, 574 So. 2d 644, 653-54 (Miss. 1990).

7

¶24.    At trial, Jeffrey called Dr. Horne to testify as to Earl's mental capacity.  Dr. Horne, an internist, had never treated Earl or seen him as a patient.  While Dr. Horne testified that Earl was "an elderly, severely, and chronically ill individual with multiple medical problems," he was not able to base that opinion on any assessment that he had conducted.  Instead, Dr. Horne testified generally regarding how an elderly patient with similar medications and ailments might suffer.

¶25.    The chancellor also heard testimony from Dr. Chris Mauldin, who evaluated Earl just three days before the execution of the deeds.  Earl's medical records from that visit noted that Earl was "alert and in no acute distress" and "grossly oriented to person, time and place . . . communicat[ed] within normal limits . . . [and] [had] no evidence of aphasia."  According to Dr. Mauldin, there was no indication of a lack of mental awareness.

¶26.    Importantly, the chancellor posed a hypothetical to Dr. Horne concerning whether Earl likely understood the consequences of his actions.  The chancellor asked Dr. Horne that assuming there were five separate copies of Earl's will, which all appointed Shade as the owner of a majority of Earl's property, would the doctor have an opinion.  Dr. Horne responded, "So as a physician, if I were presented with those facts and this was a consistent thing over a long period of time, that would lead me to believe that perhaps that was an intent that was correct – that was something he truly intended and understood."  The chancellor's hypothetical was consistent with Earl's actions in each of his wills.  There was no evidence to support a conclusion that Earl did not understand the legal consequences of his actions.

8

¶27. Additionally, in light of Earl's physician's notes just days before the transfer, Jeffrey failed to prove by clear and convincing evidence that Earl suffered from a "weakness of intellect." Finally, neither party asserts that Earl was insane before or after the date of transfer.

¶28. We find no error in the chancellor's findings as to Earl's mental capacity.

> III.  *Whether the chancellor abused his discretion by admitting Earl's previous wills into evidence when they were unsigned.*

¶29. Jeffrey next argues the chancellor improperly admitted Earl's previous wills in evidence. We utilize an abuse-of-discretion standard of review when considering the trial court's decision to allow or disallow evidence. *Webb v. Braswell*, 930 So. 2d 387, 396-97 (¶15) (Miss. 2006). Jeffrey argues that several evidentiary issues preclude the use of the documents: authentication, the "Best Evidence" rule, hearsay, and relevance. We separately address each issue.

¶30. First, Jeffrey argues that the wills were not properly authenticated. Pursuant to Mississippi Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Under Rule 901(b)(1), an item of evidence can be authenticated by testimony of a witness with knowledge that the "item is what it is claimed to be."

¶31. Nita testified about the documents and their authenticity in accordance with Rule 901. Although Jeffrey takes issue with the fact that the documents admitted into evidence were

not signed, Nita drafted the documents and witnessed the execution and signatures of the originals. Moreover, the documents were not admitted into evidence in the same manner as they would be admitted for probate. The reason for the submission of the wills was to show Earl's intent at the time, which the chancellor recognized.

¶32. Second, Jeffrey argues that the admission of the wills violates Mississippi Rule of Evidence 1002, otherwise known as the "Best Evidence" rule. Rule 1002 requires "an original writing, recording, or photograph" in order to "prove [the writing, recording, or photograph's] content unless otherwise provided by law." Under Rule 1003, a duplicate or copy is admissible unless there are questions of the original's authenticity or it is unfair to admit the duplication.

¶33. In finding that the documents were admissible under Rules 1002 and 1003, the chancellor stated, "I would think that [the wills] are self-authenticating if you want to know the truth about it. Why would a lawyer have a copy of a will in their office unless somebody came in and said 'prepare this for me.'" We disagree and find the chancellor erred in his determination that the wills were admissible under Rules 1002 and 1003. The wills admitted into evidence were not signed and therefore not originals. Additionally, the unsigned wills were not duplicates or copies of the originals. Thus, their admission fails to meet the requirements of Rules 1002 and 1003. Moreover, the unsigned wills were not self-authenticating. Mississippi Rule of Evidence 902 sets forth items of evidence that are self-authenticating. The unsigned wills, which were not certified, do not qualify as self-

10

authenticating evidence under Rule 902.

¶34. Although the chancellor erred in the admission of the documents under Rules 1002 and 1003, such error was harmless based on Nita's testimony. Again, Nita testified regarding her preparation of the wills pursuant to Earl's intent and plan and further testified regarding Earl's execution of the documents. The fact that the wills admitted into evidence were unsigned is of no consequence here because this was not a probate proceeding. Instead, the unsigned documents admitted into evidence were drafted at Earl's request and are evidence of his intent. Because the documents were properly authenticated under Rule 901, the chancellor did not abuse his discretion in admitting the unsigned wills into evidence.

¶35. Finally, Jeffrey argues that the documents constitute hearsay and are irrelevant. The wills were clearly relevant as to Earl's intent and his wishes for his property after his death. *See* M.R.E. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is consequence in determining the case."). The content of the wills may contain hearsay statements, but the statements fall under the hearsay exception in Mississippi Rule of Evidence 803(3).[1] The wills contain Earl's then-existing state of mind and were used to show Earl's intent, which directly implicates the exception.

¶36. We find no error in the chancellor's admission of Earl's previous wills into evidence.

---

[1] Mississippi Rule of Evidence 803(3) states that if a statement is of a declarant's then-existing state of mind there is an exception to hearsay.

*IV.    Whether the chancellor abused his discretion when he excluded the lay opinion testimony of Bonnie Steadham.*

¶37.    In his final issue, Jeffrey argues that the chancellor erred in excluding Bonnie's lay-opinion testimony regarding Earl's mental capacity.  Mississippi Rule of Evidence 701 permits lay-opinion testimony when it is:

a.      rationally based on the witness's perception;

b.      helpful to clearly understand the witness's testimony or to determining a fact in issue; and

c.      not based on scientific, technical, or other specialized knowledge within the scope.

¶38.    While on direct examination, Bonnie was asked if she believed Earl was competent to execute the deeds on January 22, 2016.  Shade objected.  Bonnie subsequently proffered the following testimony:

[Jeffrey's counsel]:    Based on your personal observation of [Earl] on January 22nd, 2016, after you gave him that pain medication, was [Earl] competent to execute a deed or to understand that transaction involving the transfer of real estate[?]

[Bonnie]:               I don't think so.

[Jeffrey's counsel]:    Based on your personal observation of [Earl] from January 22, 2016, after you gave him his pain medication and his muscle relaxers and Xanax, do you have an opinion as to whether or not he had the mental capacity to understand the nature of the transaction of transferring real estate, the rental houses, and the land?

[Bonnie]:               I don't think so.

¶39.    In response to the proffer, the following discussion occurred:

12

The Court:   Did [Earl] say or do anything unusual after he took the medicine?

[Bonnie]:    To me, no, because, you know, I'd been with him so long and everything was - he was just Earl as [far as] I was concerned.

¶40.    Because Bonnie did not observe or perceive "anything unusual" following the use of the medications, there was no underlying basis for her opinion that Earl had a diminished mental capacity. Moreover, the record reflects that the chancellor heard expert testimony regarding Earl's mental capacity from at least two medical doctors, Dr. Horne and Dr. Mauldin.

¶41.    We find no error in the exclusion of Bonnie's testimony regarding Earl's mental capacity.

¶42.    **AFFIRMED.**

**BARNES AND CARLTON, P.JJ., WILSON, GREENLEE, WESTBROOKS, TINDELL, McDONALD AND LAWRENCE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WESTBROOKS, J.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶43.    I agree with the majority that there was no undue influence by Shade – Earl's grandson. However, I write separately because I believe that our Rules of Evidence explicitly allow laypersons to testify as to mental capacity. Therefore, I would find that the chancellor erred in excluding Bonnie Steadham's lay-opinion testimony regarding Earl's mental capacity. For this reason, I concur in part and respectfully dissent in part.

¶44.    Lay witnesses can "testify to opinions they have which are 'rationally based on the

13

perception of the witness' and 'helpful to the clear understanding of the testimony of the determination of a fact in issue.'" 4 Jeffrey Jackson, et al., *Encyclopedia of Mississippi Law* § 33:67, at 737 (2d ed. 2016) (quoting M.R.E. 701). Rule 701 "allows witnesses to testify about information they have personally observed and which might assist the trier of fact." M.R.E. 701.

¶45. Bonnie possessed special knowledge about Earl's mental status given their dating relationship and her many years as his caretaker. Her testimony was valuable to assist the determination of a fact in issue: Earl's mental state at the time he executed his will—particularly while under the influence of certain medications. Bonnie testified that Earl was, in her opinion, "addicted to too much medicine" and would often fall after taking his muscle relaxers. Bonnie also testified to her opinion that Earl did not have mental capacity at the time he executed the will:

> [Jeffrey's counsel]: Having been with him on that medication, was he competent to execute that will on that January 20th, 2016?
>
> [Bonnie]: I don't think so.
>
> [Jeffrey's counsel]: Okay. And did he have the mental capacity to fully understand that he was giving away to his grandson five rental houses and about 166 acres of land?
>
> [Bonnie:] I don't think so, but Shade was his heart.

¶46. Lay witnesses can testify to their opinion that a person has had too much alcohol. *See Havard v. State*, 800 So. 2d 1193, 1196 (¶7) (Miss. Ct. App. 2001). They can also testify that

14

a person appears under the influence of drugs or alcohol or that the person appears to be mentally disturbed. *See Brown v. State*, 981 So. 2d 1007, 1014 (¶20) (Miss. Ct. App. 2007). This is exactly what Bonnie did when she testified to her opinion that she did not believe Earl had mental capacity when he executed the will while on the medications.

¶47. Bonnie's opinion testimony was based on her personal knowledge and observation of Earl. This is what Rule 701 explicitly allows. Therefore, it was error for the chancellor to exclude her opinion testimony. In this particular case, the error is harmless as both parties had expert testimony regarding Earl's mental competency. In other cases, it may not be so.

¶48. For this reason, I concur in part and respectfully dissent in part.

**WESTBROOKS, J., JOINS THIS OPINION IN PART.**