# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01234-COA

RACHEL PAULINE HOLCOMBE, EXECUTRIX **APPELLANT**
OF THE ESTATE OF JOYCE LOUISE PHELPS
KING

v.

THE ESTATE OF MARVIN LARUE KING, **APPELLEES**
DECEASED, CANDACE K. GREENE, AND
CHADWICK L. KING

DATE OF JUDGMENT: 02/24/2021
TRIAL JUDGE: HON. WAYNE SMITH
COURT FROM WHICH APPEALED: PIKE COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: TODD BRENTLEY OTT
                          GARY L. HONEA
ATTORNEYS FOR APPELLEES: KIMBERLY COURTNEY KING
                          SHERRIE LYNN DEWOLF
                          CONNIE MARIE SMITH
NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION: AFFIRMED - 06/06/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McCARTY AND SMITH, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A homeowner transferred warranty deeds for her house and property to her son and

daughter-in-law. After the son and daughter-in-law passed away, she sought to have the

warranty deeds set aside on the basis of a confidential relationship, claiming undue influence

from her son.

¶2.     After hearing from several family members and the legal staff who prepared the

deeds, the trial court found that the factors of a confidential relationship were not met by

clear and convincing proof. As this finding was supported by substantial evidence, we affirm.

## BACKGROUND

¶3. While testimony at trial varied, in general the core facts of this case are not in dispute. Along with her husband C.J., Joyce King owned several pieces of property in McComb, including one parcel of about an acre on which her home sat, at 2124 Highway 98 East. Their son Marvin Larue and his wife Burlene lived next door, at 2126 Highway 98 East.

¶4. In 1996, C.J. and Joyce delivered a warranty deed to Larue and Burlene for 1.5 acres of land. In 2013, C.J. passed away. Joyce kept living in her home at 2124 Highway 98 East.

¶5. A year later, her daughter Brenda moved in with her. Brenda had been struggling financially and dealing with depression in the wake of a stroke and job difficulties.

¶6. The home at 2124 was modest: two bedrooms, a den, and a living room. Brenda moved into the smaller bedroom while her mother stayed in the larger one. Next door at 2126, Larue and Burlene lived in a mobile home, which was not in great shape. Larue himself was not in great shape either, having suffered a series of setbacks to his health. He was in a wheelchair, had congestive heart failure and a history of heart attacks, and was on dialysis.

¶7. The year after Brenda moved in with their mother, Larue had another heart attack. When he was discharged, he and Burlene didn't return to the trailer but, instead, moved in with his mother. Brenda recalled Burlene bringing over Marvin's oxygen machine and clothes. Brenda stayed in the small bedroom while Burlene slept in her mother-in-law's bed

2

with her; Larue slept in a recliner in the den, which was apparently better for his congestive heart failure.

¶8.     After Larue and Burlene lived with her for a while, in 2015, Joyce, Larue, and Burlene entered into a series of land transactions. First, in January 2015, Joyce executed a warranty deed to her son and daughter-in-law for about 1.3 acres. Later, in March 2015, Joyce executed another "1.00 acre, more or less," containing her home, to Larue and Burlene. Two months later, in May, Larue and Burlene deeded her a life estate in the one acre containing her home.

¶9.     Burlene died in the summer of 2017, and about two years later, her husband Larue passed away as well. Their interest in the property descended to their children, Chadwick and Candace, while Joyce still lived in the house at 2124 Highway 98 East.

¶10.    But just a few months after Larue's death, a lawsuit was filed. Joyce had granted her daughter Rachel a power of attorney, and pursuant to that authority, Rachel filed a complaint in chancery court against Larue's estate and Chadwick and Candace as his beneficiaries. The complaint contained a single count to set aside a deed: "that Joyce King's conveyance of the property to Marvin Larue King and Burlene King in Pike County, Mississippi, was the misuse of a confidential relationship . . . giving rise to the presumption of undue influence[.]"[1]

## COURSE OF PROCEEDINGS

[1] While the complaint only attacked the March 2019 warranty deed for the acre with the home, a motion was made at trial to conform the pleadings to encompass the January deed for the 1.3 acres. The trial court granted the motion.

¶11.    At trial, all three of Joyce's other daughters testified in support of setting aside the two deeds—Brenda, Arlene, and Rachel.  Further, Larue and Burlene's two children, Chadwick and Candace, testified.  Also called as witnesses were the lawyer and paralegal who handled the transactions, Stewart Robison and Christina Conerly.  Joyce also testified.

¶12.    To Brenda, who had lived with Joyce during the period overlapping with Larue and Burlene, her brother Larue was domineering and aggressive.  He had been "livid that I moved in for whatever reason."  She remembered he told her that "he hated me and nobody at his house had any good feelings about me at all" and that she "was hated by his entire family."

¶13.    While the details were unclear, Larue's daughter Candace later explained she had been "taken away" from her parents when she was little, and Larue apparently ascribed the action by DHS to Brenda's involvement.  And Brenda admitted she and her brother "didn't have a good relationship at all" and explained how he had kicked her out of the house.  But she conceded that when they all lived together, she had a bedroom while he slept in a recliner.

¶14.    Brenda agreed that her mother mowed the yard, bought the groceries, cleaned the house, and took other people to the doctor.  Nonetheless, she did not believe that her mother was able to sign the warranty deed in 2019, and Brenda saw her as being dominated by Larue and Burlene and dependent on them.  "My mother is sweet and meek," she told the trial court.

¶15.    Another daughter, Arlene, testified she was concerned about how close her mother was to Larue and told her at one point, "[Y]ou're acting like Larue is your husband."  Arlene conceded that her mother was in better physical health than her brother Larue.  Nonetheless,

4

"[s]he was like walking on eggshells all the time." She saw Larue as putting a "pleasant" face out to the world, "[b]ut when the door closed and it was just everybody at home, it was his way or no way."

¶16. Arlene also talked about her brother's dire health conditions, including his heart attacks and kidney failure. She described that her mother would drive Larue to Tylertown for his dialysis. After his wife died, "Momma started getting up, and it was like at 4:00 in the morning she'd have to drive him over there."

¶17. On cross, Arlene conceded she didn't know much about the family for a period of time between 1990 and 2005 because she was estranged from both her parents and her brother Larue. She also lived in Louisiana. And when asked who was in the better physical condition between her mother and brother, she testified, "Physical health, I would say my mother."

¶18. The trial court also heard from Joyce's daughter Rachel, under whose authority the lawsuit was filed. Rachel believed Larue had alienated her mother away from the rest of the family. She didn't "have any doubt in [her] mind that he influenced her" mother to deed the property to him and his wife. Nonetheless, Rachel admitted Larue had "been disabled for quite some time" and that the mobile home he and Burlene previously lived in "was pretty bad the last days," later selling "for a couple of thousand dollars." And while she lived in Brandon and Arlene lived in Louisiana, it was Larue and Burlene who had lived by Joyce since 1996.

¶19. In contrast to their aunts, Chadwick and Candace did not see their father as running

5

the show. Candace saw her father as "needy" due to his many health problems. And while there were "a lot of people in [her grandmother's] house," Candance was "not going to say there was a dominant one." When pressed whether her father was intimidating, as his sisters thought, Candace said, "Not to me."

¶20. Like his sister, Chadwick saw his parents and grandmother as a healthier unit with reciprocating duties. He thought his parents moved in with Joyce "to help my grandmother some. And my grandmother was helping my father at the time too. They was helping—kind of helping each other a little bit." As he had put it in a deposition, his parents "help[ed] my Mamaw and Mamaw . . . help[ed] my dad."

¶21. In contrast to his aunts, Chadwick painted a portrait of his father as deeply wounded. "He was a diabetic and he had a bad heart, bad liver, and all kind of issues," and part of his foot had been amputated. The latter left him wheelchair-bound, though he sometimes used a walker to move a few feet. This was in addition to Larue's diagnosis of congestive heart failure, as well as "multiple" heart attacks over the years. He was also on dialysis.

¶22. In terms of health, Chadwick ranked the household as his "mother, and then it was my grandmother, and then it was my dad." "And my mom was helping with them, like, would take them to doctor's offices, take my dad or somewhat." When pressed if his parents "resented" his aunt Brenda living in the house, he responded, "I never heard that out of their mouth."

¶23. Attorney Stewart Robison, who was retired by the time of trial, explained how he had handled the preparation of the warranty deeds at issue, especially the March deed for the

house and its one acre.  In general, he would question the grantor and check to see if the person understood what she was doing.  "And I would have made sure that Ms. Joyce understood, in this case particularly, that she was deeding her homestead property to [Larue] and Burlene."  The lawyer testified he handled the transaction like any other.  "And I didn't have any doubt in my mind about Ms. King's competency."

¶24.    In terms of Joyce's health, he testified she "looked fine to me."  The former lawyer pointed out that "of course, [Larue] and Burlene both are dead, and Ms. King sits here today."  In his view, he saw Larue as "in a lot worse shape than his momma" when the deeds were signed.  "I promise you that."

¶25.    The lawyer's former legal assistant, Christina Conerly, testified as well.  She handled the January deed for 1.3 acres and then the life estate deed executed later that year from Larue and Burlene to Joyce.  She had no specific recollection of the events but did not remember anything that led her to believe Joyce did not understand what was happening.  There was also nothing that triggered her concern that Joyce was not there of her own free will.  "I mean, they seemed like family," she testified.  "They came in together.  I didn't see any issues."

¶26.    Joyce herself took the stand.  82 years old at trial, she told the court that Larue "kept after me constantly.  It was a everyday thing that he wanted that property."  As to her son, she testified "I felt like he controlled me."

¶27.    As to who ran the household, Joyce asserted she was mostly in charge.  When asked if she agreed "that Burlene and Larue paid for some of the expenses around the home," she

responded, "[T]hey didn't do much of it. They done a little." At best, she agreed the expenses were shared. She also did the cooking at the house. She agreed that "in some ways" she was in better health than her son. While she had stayed four or five days at St. Dominic's in March 2015, she was released without follow-up therapy.

¶28. When asked if her son took care of her, Joyce responded, "I don't know nothing he done for me." In contrast, she said she took care of him.

¶29. But it was Larue and Burlene who drove her to the lawyer's office to sign the deeds, she said. She allegedly didn't know what she was signing or what was going on. However, on cross, she admitted she did know what was going on when she signed the deeds. When asked if she "knew [she was] giving up [her] property when [she] signed the deed," she responded, "Well, I was, but it wasn't something that I really wanted to do, but I was trying to keep peace."

¶30. From the bench, the trial court first determined that there was a confidential relationship. Nonetheless, a few weeks later, the written order took the opposite tack and withdrew that ruling. In examining the elements of a confidential relationship, the trial court found that Joyce was not taken care of by her son, and indeed the proof was that she took care of him. The trial court did find "that there was a close relationship" and that Burlene was on Joyce's joint account and used it for six checks, but there was no usurpation of control. There was no evidence of a power of attorney.

¶31. In the end, the trial court found that the burden of proof for "a confidential relationship was not established," so the court would "not scrutinize an otherwise valid deed"

8

for undue influence.

¶32.    Rachel filed a notice of appeal, and the case was assigned to this Court for review.

**DISCUSSION**

¶33.    On appeal, the Estate of Joyce, through her daughter Rachel, asks us to find that she had a confidential relationship with her son Larue, arguing the trial court erred by finding there was not one and committed errors of law and fact in that decision. If we accept this argument, the Estate requests reversal and remand "on whether the presumption of undue influence was rebutted by clear and convincing evidence."

¶34.    In advancing their position, the Estate argues the trial court misstated or misapplied the confidential relationship factors and also made mistakes in findings of fact. Because these two issues are intertwined, we address them together.

¶35.    Our Supreme Court has held that "a confidential relationship does not have to be a legal one, but the relation may be moral, domestic, or personal." *Wright v. Roberts*, 797 So. 2d 992, 998 (¶17) (Miss. 2001). "The confidential relationship arises when a dominant, over-mastering influence controls over a dependent person or trust, justifiably reposed." *Id*.

¶36.    To ascertain if there was undue influence in a relationship, which requires setting aside an inter vivos or testamentary gift, one must first establish that there was a confidential relationship, creating "a two-step process involving shifting burdens of proof." *Howell v. May*, 983 So. 2d 313, 318 (¶14) (Miss. Ct. App. 2007). "As for the first step, the burden is on the plaintiff who seeks to have a chancellor set aside an inter vivos gift." *Id*. "If a plaintiff can demonstrate, by clear and convincing evidence, the existence of a confidential

9

relationship between a grantor and a defendant grantee, a rebuttable presumption of undue influence arises regarding any inter vivos transactions between the grantor and the defendant grantee." *Id.*

¶37. "To determine whether a confidential relationship exists," we have held the following factors should be considered:

> (1) whether one person has to be taken care of by others,
> (2) whether one person maintains a close relationship with another,
> (3) whether one person is provided transportation and has their medical care provided for by another,
> (4) whether one person maintains joint accounts with another,
> (5) whether one is physically or mentally weak,
> (6) whether one is of advanced age or poor health, and
> (7) whether there exists a power of attorney between the one and another.

*Id.* (cleaned up).

### A. The trial court made no legal errors.

¶38. The Estate argues that the trial court "applied an erroneous legal standard in evaluating the factor of the joint account." Yet this argument ignores the substance of the trial court's detailed opinion.

¶39. In accord with *Howell*, the trial court considered "whether one person maintains joint accounts with another." In its written order, the trial court first determined "that Joyce King created a joint account with Burlene King," referring to specific exhibits. The trial court reviewed the six times Burlene signed checks for Joyce in a thirteen-month period. The six checks totaled $387.22. The trial court found that "[a]ll remaining checks were signed by Joyce" and determined "there was no abuse of this account[,] and it appears that Burlene King was added to this account for convenience only." As a result, the trial court concluded

10

there was no showing "that Burlene King asserted any control over this account or over the funds of Joyce King."

¶40. On appeal, the Estate argues that the trial court "misapprehended this factor, which only considers whether a joint account exists[.]" Because the trial court did more than just make that minimal finding, the Estate argues it erred.

¶41. This was not error. First off, it is well settled that the confidential-relationship inquiry is not a checklist made by a chancellor; indeed, our precedent warns against "mechanistically" making such a finding without further deliberation. *Costello v. Hall*, 506 So. 2d 293, 299 (Miss. 1987). The presence of one factor, without more, does not mean a confidential relationship was established. *Id.* (reversing when trial court found only a power of attorney existed—and no other factors—in a will contest). The trial court carefully combed through the factors to ensure a thorough inquiry of whether a confidential relationship existed between Joyce and her son, not straying from the factors as urged by the Estate. In detailing its analysis in the order, the trial court did not err in considering whether the presence of her daughter-in-law on the account harmed Joyce.

¶42. The Estate's second argument falters for similar reasons. The Estate argues the "chancery court made a clear error of law in its recitation and application of the factors of advanced age or poor health." *Howell* asks "whether one is of advanced age *or* poor health"; in its written order, the trial court considered "[w]hether one is of advanced age *and* of poor health." (Emphasis added). The court found that although Joyce "was about 76 years of age, she was not in poor health at that time."

11

¶43. The Estate argues "[A] finding of advanced age, alone, is sufficient to meet this factor of the test for confidential relationship." As set out above, it means little that one factor of six was checked, as trial courts are not machines simply tallying numbers. While the precise language strayed from precedent, the trial court considered the ultimate interpretation of Joyce's relatively advanced age. Furthermore, to the extent there was any error, it had little impact since the previous factor, "whether one is physically or mentally weak," was likewise thoughtfully considered by the trial court.

¶44. Accordingly, we find these assignments of error to be without merit.

### B. The trial court made no factual errors.

¶45. The Estate protests the trial court "made clearly-erroneous findings of fact," arguing four in total. The Estate claims the trial court deviated from the proof as to Joyce's health at the time the deeds were executed, regarding the close relationship in the home among Joyce and Larue and Burlene, that Joyce's transportation and medical care were provided for by others, and that she was not physically or mentally weak at the time she signed over the warranty deed to her home.

¶46. Yet the proof of these factual issues varied at trial. The trial court analyzed each of the factors required by *Howell* and made findings of fact based on the many witnesses called at trial. Indeed, under some of the factors, the trial court made a finding that the Estate sought but did not give it the weight the Estate desired. The Estate even admits as such, arguing the trial court "plac[ed] inordinate weight" on some testimony over others.

¶47. But to weigh the import of the testimony is the role of the trial court, not this Court.

12

There was simply a split in testimony in the trial, and nearly all the witnesses had a personal stake in the litigation. Chadwick and Candace had inherited their parents' ownership in the property and home, while Arlene, Brenda, and Rachel lost any interest due to their mother's transfer of property to Larue and Burlene. It is a foundational component of our law that it is within the discretion of the trial court, not this Court, to determine credibility and weigh the testimony of the parties. *See Harris v. Tom Griffith Water Well & Conductor Serv. Inc.*, 26 So. 3d 338, 342 (¶8) (Miss. 2010) ("The case essentially hinged on the conflict between [the parties'] testimony, and, as the finder of fact, the chancellor was within his discretion to find [which] version was the most credible.").

¶48.    It is a steep path to prove a confidential relationship. *Howell* requires the plaintiff to meet this burden "by clear and convincing evidence[.]" 983 So. 2d at 318 (¶14). And of the seven factors required to be met by clear and convincing proof, the trial court found Joyce and her daughters met only a few. As to the first, "whether one person has to be taken care of by others," Joyce herself insisted she was the one who provided care to Larue, not the other way around. The trial court found that the second, "whether one person maintains a close relationship with another," was met, as the trio lived together. But as to the third, "whether one person is provided transportation and has their medical care provided for by another," the proof was nearly universal that Joyce was the one who provided for her wheelchair-bound son and took him to Tylertown for dialysis.

¶49.    The trial court did examine the fourth factor, "whether one person maintains joint accounts with another," and found, as set out above, that while Burlene was on an account

13

with her mother-in-law, this did not result in an abuse of that privilege. As to the fifth and sixth factors, "whether one is physically or mentally weak" and "whether one is of advanced age or poor health," the proof varied. Joyce survived Larue and Burlene but had her own health problems and was in her late 70s at the time the deeds were transacted. The trial court found Joyce did not meet her burden here, and as to the last factor, "whether there exists a power of attorney between the one and another," the parties agreed it was not present.

¶50.  On appeal, the Estate focuses on the testimony Joyce provided at trial—where she stated Larue "kept after [her] constantly" and how it was an "everyday thing that he wanted that property." However, this evidence goes more to the second series of factors regarding undue influence, which we only examine once a confidential relationship is found.

¶51.  And as to Larue's influence over his mother, other witnesses were more measured in their description of the relationships in play. For instance, Candace testified, "I didn't know there was any dominant person" in the home and said that her father Larue was never intimidating to her; Chadwick pointed out that his father "had a bad heart, bad liver, and all kind of issues" and indeed pre-deceased his own mother; and last, lawyer Robison told the trial court, "I didn't have any doubt in my mind about Ms. King's competency."

¶52.  While the mother said that she "felt like [Larue] controlled me," the trial court also had before it evidence that Joyce cooked for the household, handled her own finances (except for the modest amounts drawn from the bank account by her daughter-in-law), and perhaps most importantly, was the one who actually had to care for her wheelchair-bound son, not the other way around. By the time he moved in with his mother after another heart attack,

14

Larue was mostly confined to a wheelchair and riddled with health problems. The day the warranty deed for the house was signed, the lawyer testified the son "was in a lot worse shape than his momma," and pointed out that at trial Larue and his wife "both are dead, and [Joyce] sits here today."

¶53. Furthermore, the trial court also heard that it wasn't duress or control that compelled Joyce to deed over the property—but her own desire for harmony. Rachel described her mother as a "peacemaker," and Arlene said that "she just goes along to keep peace." Joyce herself described the transaction as one that she was not forced to do—and that it "wasn't something that I really wanted to do, but I was trying to keep peace."

¶54. As to Joyce's health, while she was not without problems, the trial court saw and heard her in the courtroom and found that she was "coherent, intelligent and fully capable of handling her own affairs." The trial court acknowledged that her lawyer found her competent, as did the notary who handled the signing process of the warranty deeds. The Estate strongly argues that Joyce had been recently hospitalized before signing the deed, and medical records were introduced at trial. But there was also testimony that she had been discharged straight to her house after a hospital stay.

¶55. Regardless of our view of the testimony, whether the facts of this case met the factors of a confidential relationship "presented a question of fact for the court, and the chancellor resolved the conflict by ruling that the hearing testimony was the most credible." *Est. of Griffith v. Griffith*, 30 So. 3d 1190, 1193 (¶13) (Miss. 2010). As a result, we will not disturb the trial court's decision, for "when the trial judge sits as the finder of fact, he has the sole

15

authority for determining the credibility of witnesses." *Id*. (Internal quotation and citation omitted). Since "our trial courts are entitled to deferential review in matters involving questions of fact," and there was no showing "of manifest error, we cannot say that the chancellor erred." *Id*.

¶56. Because the trial court did not abuse its discretion in determining there was not a confidential relationship between Joyce and Larue, resolving as it did disputed areas of fact, the trial court was correct not to proceed to the undue influence test. For these reasons, we affirm the trial court's order in all respects.

## CONCLUSION

¶57. Before the question of undue influence is reached, a party must first establish a confidential relationship existed. After hearing from many witnesses, the trial court made findings of fact that the burden of proving a confidential relationship was not established. Because the trial court acted within its discretion, we find the trial court's order must be affirmed.

¶58. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**

16